David L. Hecht
dhecht@hechtpartners.com
Maxim Price (*pro hac vice* forthcoming)
mprice@hechtpartners.com
Peter Joon Park
ppark@hechtpartners.com
Tanner Murphy (*pro hac vice* forthcoming)
tmurphy@hechtpartners.com
HECHT PARTNERS LLP
125 Park Avenue, 25th Floor
New York, New York 10017

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **REINCUBATE, LTD.,** | |
| Plaintiff, | Case No.:  26-cv-828 |
| v. | |
| **APPLE, INC.,** | **COMPLAINT** |
| Defendant. | |

## TABLE OF CONTENTS

NATURE OF THE ACTION ....................................................................................2

PARTIES ..............................................................................................................3

    I.     Plaintiff Reincubate ..............................................................................3

    II.    Defendant Apple ..................................................................................4

JURISDICTION AND VENUE ...........................................................................10

RELEVANT FACTS ...........................................................................................12

    I.     Apple's Violation of the Sherman Act................................................12

        A.    Apple has a monopoly in the mobile operating system market ...............13

        B.    Apple maintains monopoly power through anticompetitive conduct .......17

           i.    Apple's iOS.................................................................. 17

    II.    Apple's Willful Infringement of United States Patents Nos. 11,924,258 and 12,335,323 ...............................................................................42

        A.    The Reincubate Patents.......................................................... 42

COUNT I: Violation of the Sherman Act Section 2 – Monopolization ........................................50

COUNT II: Declaratory Judgment—Unenforceability of DPLA Termination Clause ................54

COUNT III: Infringement of United States Patent No. 11,924,258 ...............................................56

    A.    Continuity Camera ....................................................................... 56

    B.    Final Cut camera with Live Multicam in Final Cut Pro for iPad.................................. 61

COUNT IV: Infringement of United States Patent No. 12,335,323 ...............................................64

    A.    Continuity Camera ....................................................................... 64

    B.    Final Cut camera with Live Multicam in Final Cut Pro for iPad.................................. 69

JURY DEMAND ...............................................................................................72

PRAYER FOR RELIEF ....................................................................................72

1.      Reincubate, Ltd. brings this action against Apple Inc. for anticompetitive conduct and patent infringement. Apple induced Reincubate to develop and disclose its Camo technology. But because Camo provided interoperability between iPhones and Windows computers, as well as between Android devices and Mac computers, Apple copied the technology, built it into iOS as "Continuity Camera," and used its control over its operating systems and App Store to disadvantage that interoperable solution and redirect user demand to Apple's own platform-tied offering. Apple's conduct preserved its dominance in mobile operating systems and suppressed innovation that would have reduced user lock-in. As a direct result, Reincubate suffered, among other harms, the loss of its core competitive position and commercial upside from Camo after Apple induced it to prove the market and then used its OS and App Store control to copy the technology, prevent equal technical access, and redirect demand to Apple's own bundled substitute.

2.      For many years, Apple has built a closed iPhone platform and ecosystem that has driven the company's astronomical value, an approximately $3.7 Trillion market cap as of the date of filing of this complaint.  For instance, the United States has recently alleged that Apple "has long understood that disruptive technologies and innovative apps, products, and services threatened [its] dominance by making users less reliant on the iPhone or making it easy to switch to a non-Apple smartphone."[1]  One such innovative and disruptive technology is Camo, an app by Plaintiff Reincubate, Ltd. ("Reincubate").

3.      Apple itself recognized Reincubate's innovation introduced in its Camo app, naming it an Apple Design Awards Finalist (Innovation Category) in 2023 at Apple's Worldwide Developer Conference ("WWDC").  Camo transformed any iPhone, Android phone, iPad, or Android tablet into a powerful and customizable webcam for a Mac or other personal computer ("PC"), including those that run Windows.  Accordingly, Camo enables cross-device interoperability: smartphone or tablet cameras can be used on different platforms, including Mac and non-Mac personal computers and non-Apple software, like Zoom, Google Meet, Microsoft Teams, Chrome, and dozens of other video recording and streaming products.  Camo's cross-device interoperability is a threat to Apple's device lock-in.

---

[1] *United States of America, et al. v. Apple Inc.*, No. 2:24-cv-04055 (JXN-LDW), at United States District Court for the District of New Jersey (filed Mar. 21, 2024), ECF No. 1 at 3.

4.      Reincubate's Camo was the first high-quality, commercially successful product to enable reliable high fidelity use of a smartphone—whether iPhone or Android—as a webcam for Mac and Windows computers. Although limited prior tools had attempted similar functionality, none provided high definition video, low-latency, frame-accurate synchronization and rendering, high security, and cross-platform interoperability that Camo introduced in 2020. With its introduction in 2020, Camo finally provided this missing seamless interoperability between Apple's iOS devices and PCs, as well as between Android smart devices and Macs.

5.      Camo was used by thousands of Apple employees, across all divisions of the company.  At first, Apple encouraged Reincubate to increase its investment in Camo.  But when Apple recognized that Camo was a threat—it took steps not only to copy it, thereby infringing Reincubate's patents, but also to undermine Camo's functionality such that Reincubate could not compete with Apple's rip-off, called Continuity Camera, which was only operable between Apple devices and Mac computers.  In other words, Apple crippled Camo so as to hamstring its potential for interoperability between iPhones and PCs, as well as between Androids and Macs.  Apple's conduct constitutes monopolization and maintenance of monopoly power, in violation of Section 2 of the Sherman Act.

## NATURE OF THE ACTION

6.      For years Apple actively encouraged Reincubate, a London-based software company, to develop Camo and to communicate openly about it with Apple. Reincubate obliged and provided Apple with constant technical updates as well as market updates related to Camo's commercial success. Then, when Apple realized the sizeable and growing customer support behind Camo, and that the software provided interoperability between Apple devices and Android devices, it incorporated the technology directly into its mobile operating system, iOS and made it impossible for Reincubate to compete by, among other things, refusing to provide any path to access the smooth, low-latency Wi-Fi access on Apple's devices that was key to Camo's ability to deliver interoperability between Apple's devices and PCs and/or Android devices. There was no legitimate business purpose for constructively cutting off this path. Apple did this in furtherance of preserving its mobile operating system monopoly relative to its only possible competitor, Android. Thus, this action arises under Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, to redress and restrain Apple's unlawful monopolization in the United States mobile operating

systems market. Reincubate seeks injunctive relief, treble damages, attorneys' fees, and such other relief as the Court deems just and proper to restore competition and prevent further harm.

7.      This is also an action for Apple's willful direct and indirect infringement of Reincubate's United States Patent Nos. 11,924,258 and 12,335,323, in violation of the United States Patent Act, 35 U.S.C. §§ 100 *et seq*. Apple has infringed by, without authorization, making, using, offering for sale, and selling devices running iOS, iPadOS, macOS, and tvOS that support the "Continuity Camera" functionality, as well as software products including "Final Cut Camera" with Live Multicam functionality in Final Cut Pro for iPad. Reincubate seeks preliminary and permanent injunctive relief to prevent Apple from continuing its harmful infringement. In addition, Reincubate seeks monetary damages for Apple's past and ongoing infringement, including enhanced damages for Apple's willful misconduct.

8.      Reincubate does not allege that Apple's copying alone—so-called "Sherlocking"— is always unlawful (though its infringement of Reincubate's patents here is plainly unlawful). What makes this conduct anticompetitive is that Apple actively cultivated Reincubate's trust, actively encouraged Reincubate to spend its resources developing the Camo product, induced the company to share confidential technical details and beta builds, and then used that privileged access to shape its own Continuity Camera feature. Only after Reincubate had demonstrated that the solution worked, that demand existed, and that the model was viable did Apple absorb the concept. Apple did not merely replicate Camo's functionality; it embedded it at the operating-system level, pre-installed it on every device, and configured the platform in ways that displaced Camo, failed to give access to key APIs, foreclosed certain interoperability, and strengthened Apple's lock-in. After Reincubate spent years and millions developing and proving the Camo model, Apple absorbed it into iOS as a first-party feature. Apple undertook this conduct to maintain its monopoly power, knowing that an independent, cross-platform solution like Camo would otherwise enable full compatibility with Android and undermine Apple's strategy of locking users into its own ecosystem. This is not mere competition on the merits; it is the exploitation of a monopolist's platform control to eliminate a competitive threat across that ecosystem.

## PARTIES

### I.    Plaintiff Reincubate

9.      Plaintiff Reincubate Ltd. ("Reincubate") is an award-winning company organized

and existing under the laws of England and Wales, with company registration number 5189175 and VAT number GB151788978. Reincubate maintains its principal place of business in the United Kingdom.

10.     Reincubate is a well-established, award-winning software company that builds on more than a decade of real-world engineering, innovation, and market success. The company has been awarded the King's Award for Innovation — the highest official business honor conferred in the United Kingdom — on separate occasions, reflecting sustained excellence in technical achievement and contribution to industry. Over the years it has produced widely used tools (including the world's first iOS data-recovery tool), delivered enterprise-grade software, amassed multiple patents, and developed consumer applications such as Camo, which, as mentioned earlier, was nominated by Apple for the Apple Design Award — Innovation.

## II.    Defendant Apple

11.     Defendant Apple, Inc. ("Apple") is a global technology company with headquarters in Cupertino, California.  Apple is organized and existing in the State of California with its principal place of business located at One Apple Park Way, Cupertino, California 95014.  Apple is one of the world's most valuable public companies with a market capitalization approximately $3.7 trillion. For Apple's fiscal year which ended on September 28, 2024, Apple generated annual net sales of over $391 billion and net income of over $93.7 billion.[2] Apple's net income exceeds nearly every other company in the Fortune 500 and the gross domestic products of more than 100 countries.

12.     The iPhone—Apple's flagship product—remains the central engine of the company's growth and profitability, consistently achieving profit margins exceeding 30 percent on hardware alone, far surpassing most other smartphone makers. Since 2012, iPhone sales have accounted for the majority of Apple's annual revenue.

13.     Apple has steadily expanded the ways it generates income from iPhone customers beyond the initial device purchase. These include iPhone care and upgrade programs, apps and in-app purchases, paid digital subscriptions—such as for Apple's music, television, news, gaming, fitness, and cloud storage services—as well as accessories like Apple watches, tracking devices,

---

[2] Apple Inc., Annual Report (Form 10-K) (Sept. 28, 2024),
https://www.sec.gov/Archives/edgar/data/320193/000032019324000123/aapl-20240928.htm.

headphones, chargers, and protective cases. Apple categorizes these offerings under "Services" and "Wearables, Home, and Accessories." Additional sources of revenue from iPhone customers include (1) advertising revenue (such as the Apple App Store, Apple News, and Apple search ads); (2) Payment and financial services (such as Apple Pay where Apple takes a commission from every single sale); (3) Developer and App Store fees; (4) Enterprise services; and (5) Licensing and Royalties (such as Google's reported payment of billions of dollars annually for default search engine placement). In fiscal year 2024, those segments together produced around one-third of Apple's overall revenue—roughly four times the amount earned from Mac computer sales. Among the biggest revenue drivers in these areas are the Apple Watch and the App Store, where iPhone owners buy and download applications. Over time, Services have made up a growing portion of Apple's income, with the iPhone continuing to serve as the primary channel through which U.S. consumers access them.

14.    Apple has long been the leading smartphone vendor in the United States.[3] Indeed, at least as early as 2020 Apple commanded nearly 50% of the U.S. smartphone market. That number has increased. In 2024, Apple's U.S. market share stood at over 61%.[4] Further, industry data suggest that Apple commands over 70% of the performance smartphone market within the U.S.[5] Thus, Apple's market share has remained remarkably durable and is only showing a tendency to increase.

15.    Apple currently holds a dominant share of the U.S. smartphone market—generally estimated at nearly 60 percent of unit shipments in recent quarters.[6] These market shares have remained remarkably durable over the last decade and are showing a tendency to increase in Apple's favor.

16.    Apple's share of the smartphone market does not fully capture the extent of its

---

[3] H.R. Comm. on the Judiciary, 117th Cong., Investigation of Competition in Digital Markets (Comm. Print 2020) at 332, https://www.govinfo.gov/content/pkg/CPRT-117HPRT47832/pdf/CPRT-117HPRT47832.pdf.
[4] Ash Turner, *US Smartphone Market Share (2025)*, BANK MY CELL (Jan. 4., 2025), https://www.bankmycell.com/blog/us-smartphone-market-share
[5] *United States of America, et al. v. Apple Inc.*, No. 2:24-cv-04055 (JXN-LDW), at United States District Court for the District of New Jersey (filed Mar. 21, 2024), ECF No. 1.
[6] Counterpoint Research, U.S. Smartphone Market Share, https://counterpointresearch.com/en/insights/us-smartphone-market-share (last visited Jan. 5, 2026).

dominance—or its potential for continued growth—within important demographic groups, particularly younger Americans. Roughly one-third of all iPhone owners in the United States were born after 1996, compared with only about 10 percent of Samsung users, Apple's nearest rival in the smartphone market. Surveys indicate that up to 88 percent of U.S. teenagers plan to choose an iPhone as their next device. iPhone users also disproportionately belong to higher-income households. Since most consumers rely on a single smartphone to access related services and products, securing these key user groups enables Apple to generate more spending on iPhone-linked offerings, achieve higher per-user margins than its competitors, and exert greater influence over app developers and others participating in the smartphone ecosystem.

17.    In fiscal year 2024, Apple spent approximately $31 billion on research and development.[7] By comparison, Apple spent $94.95 billion on stock buybacks during the same year.[8] Thus, Apple invests far more in financial engineering and shareholder enrichment than in actual innovation. This creates for Apple a powerful financial incentive to preserve its existing monopolistic ecosystem and prevent disruptive innovations like Camo from loosening its hardware-software grip. Services is Apple's largest revenue segment aside from the iPhone, and it has become the company's primary engine of revenue growth and profitability.[9] Apple has expanded these service revenues by designing a tightly controlled, closed ecosystem that locks users in and limits their ability to rely on competing platforms or third-party solutions.

18.    Founded in 1976, Apple spent its first quarter-century largely devoted to developing and selling personal computers. Although the broader PC market grew over the following decades, Apple found it difficult to achieve widespread adoption for its higher-priced products when compared with lower-cost competitors such as IBM and Microsoft. In the late 1990s, Apple undertook a major corporate restructuring and adopted a new strategy that extended

---

[7] *Apple Inc. Research & Development Expenses 2006–2024*, MACROTRENDS, https://www.macrotrends.net/stocks/charts/AAPL/apple/research-development-expenses (last visited Jan. 23, 2026).
[8] *Apple Inc. FY2024 Review: Revenue, Cash & Buybacks*, MONEXA (Aug. 13, 2025), https://www.monexa.ai/blog/apple-inc-aapl-fy2024-review-revenue-cash-buybacks-AAPL-2025-08-13.
[9] Visual Capitalist, "Charted: How Apple Makes Its $391B in Revenue," available at https://www.visualcapitalist.com/charted-how-apple-makes-its-391b-in-revenue/ (last visited Dec. 3, 2025); Voronoi, "Apple's Growth Engine Shifts from Hardware to Services," available at https://www.voronoiapp.com/technology/-Apples-Growth-Engine-Shifts-from-Hardware-to-Services-2969 (last visited Dec. 3, 2025).

beyond computers to include consumer electronics like the iPod—a shift that ultimately paved the way for the creation of the iPhone.

19.     When Apple began developing mobile consumer devices, it did so in the aftermath of *United States v. Microsoft*, a case that opened new opportunities for innovation in areas critical to the success of Apple's later products. For instance, the iPod only gained widespread popularity after Apple created a cross-platform version of both the iPod and iTunes that worked with Microsoft's Windows operating system, which at the time dominated the personal computer market. At the time, Windows still dominated PC market share (~95%), and access to its APIs and driver interfaces was crucial. Moreover, Apple was struggling financially at the time, in the late 90s, having lost money for several consecutive years and, at times, approaching insolvency. The consent decree forced Microsoft to publish interface documentation and licensing terms that enabled third parties — including Apple — to make Windows-compatible software and devices without retaliation or discrimination. Apple was therefore able to release iTunes for Windows (in 2003) and Windows-compatible iPods, allowing cross-platform syncing through standard USB and media protocols. Without the consent decree issued in *United States v. Microsoft*, achieving that level of success—and ultimately launching the iPhone—would have been far more difficult, if not impossible, for Apple.

20.     By way of background, on May 18, 1998, the U.S. Department of Justice—joined by the attorneys general of 19 states and the District of Columbia—brought an antitrust action against Microsoft titled *United States v. Microsoft*. The suit alleged that Microsoft had violated Section 2 of the Sherman Act by maintaining a monopoly in the market for Intel-compatible personal computer operating systems. During the trial, the government demonstrated that Microsoft took deliberate actions to neutralize emerging competitive threats from "middleware" technologies, including web browsers like Netscape. Microsoft had recognized that if consumers could use middleware to reach various online content and services through remote servers over the internet, they might become less dependent on the Windows operating system.  Here, Camo presented a similar threat to Apple insofar as interoperability between mobile devices and PCs/Macs, and Apple sought to neutralize Camo's competitive threat.

21.     Microsoft similarly sought to weaken cross-platform technologies such as QuickTime, Apple's multimedia software framework designed to play audio and video on both

Mac computers and Windows PCs. According to testimony from Apple's then-Senior Vice President of Software Engineering, Microsoft "wrote steps into its operating system to ensure that a QuickTime file will not operate reliably on Windows," "tricked the user into believing that QuickTime technology is part of the problem actually caused by the Windows operating system," and "introduced greater technical incompatibilities between QuickTime and Microsoft products." Ironically, these are the sorts of steps Apple has taken, a quarter century later, against Reincubate and its Camo product, specifically the introduction of technical incompatibilities—not giving Camo access to the smooth, low-latency Wi-Fi access in both infrastructure and peer-to-peer models that Apple itself enjoys.

22.    In April 2000, the trial court concluded that Microsoft's actions constituted violations of Section 2 of the Sherman Act. On appeal, the higher court affirmed the district court's findings of liability related to Microsoft's anticompetitive conduct concerning middleware technologies.

23.    In January 2001, Apple launched iTunes, a program built on the company's QuickTime framework and promoted as "jukebox software" for managing and playing digital music. The first release of iTunes was designed exclusively for use on Apple's Mac computers.

24.    Later in 2001, Apple introduced the iPod, a portable digital music player designed to work in tandem with iTunes, allowing users to "put [their] entire music collection in [their] pocket and listen to it wherever [they] go." As with iTunes, the first version of the iPod was compatible only with Mac computers.

25.    On November 1, 2002, the trial court approved a proposed consent decree in *United States v. Microsoft*. The decree, among other provisions, barred Microsoft from retaliating against firms that created or distributed competing products such as web browsers and media players. It also required Microsoft to provide access to certain application programming interfaces (APIs) for third-party developers, including Apple.

26.    After the consent decree, in October 2003, Apple released a cross-platform version of iTunes that could run on Microsoft's Windows operating system. This expansion allowed a far broader audience to use the iPod and iTunes, including access to the iTunes Store. Through the Store, customers could purchase and download songs to play either on the iTunes desktop application or on their iPods. The move significantly broadened Apple's customer base. In the first

two years following the iPod's debut, Apple had sold only several hundred thousand units. Within a year of making iTunes compatible with Windows—and thereby reaching millions of new users— Apple's sales grew into the millions. Over the following two decades, the company went on to sell hundreds of millions of iPods, while iTunes became the leading platform for online music distribution. At a 2007 event, Apple's then-CEO remarked that the iPod "didn't just change the way we all listened to music—it changed the entire music industry." At the same event, he announced that Apple Computer, Inc. would henceforth be known simply as Apple Inc., reflecting its evolution from a computer manufacturer into a broader consumer electronics company.

27.     The widespread availability of the iPod and iTunes on Windows—made possible in part by the successful antitrust case against Microsoft—helped lay the groundwork for the creation and success of Apple's next major product, the iPhone. However, following the iPhone's launch, Apple began to restrict the growth of cross-platform technologies on its devices, including most recently against Reincubate as set forth *infra*, mirroring and far exceeding the kinds of tactics Microsoft had once used to limit such technologies on Windows.

28.     In January 2007, Apple introduced the first-generation iPhone, describing it as "an iPod, a phone, and an internet communicator," and emphasizing that users could "sync content from [their] iTunes library on their PC or Mac." Apple promoted the iPhone as an intuitive, user-friendly smartphone. Drawing on the company's experience with the iPod, Apple's then-CEO explained, "iTunes is going to sync all your media to your iPhone—but also a ton of data: contacts, calendars, photos, notes, bookmarks, [and] email accounts."

29.     The original iPhone was priced at about $299—equivalent to roughly $460 in 2025 dollars when adjusted for inflation—and required a two-year service contract with a mobile carrier. When the iPhone was first released, virtually all of its native applications were developed by Apple. The device included only around a dozen built-in apps, such as Calendar, Camera, Clock, Contacts, iPod, Messages, Notes, Phone, Photos, Safari, Stocks, Voice Memos, and Weather.

30.     Within a year of the iPhone's launch, Apple opened the platform to third-party developers, inviting them to build native applications for the device. To support this, Apple released its first software development kit (SDK)—a collection of digital tools for creating apps on Apple's iOS operating system—designed to encourage and enable outside developers, like Reincubate, to participate. Apple also provided ways for developers to generate revenue through

app sales, and later through in-app purchases and subscription models. By 2009, Apple was promoting the benefits of third-party apps in marketing campaigns featuring its now-famous slogan: "There's an app for that."

31.     Apple's decision to open its iPhone platform to third-party developers, like Reincubate, proved highly profitable for the company. The explosion of third-party apps generated billions of dollars in revenue and helped Apple build an iPhone user base exceeding 250 million devices in the United States. Despite Apple's already commanding position—holding more than 70 percent of the performance smartphone market and over 65 percent of the overall smartphone market—these figures likely understate the company's current monopoly power.

32.     Although Apple benefits from third-party developers who enhance the iPhone's value to users, its executives recognize that outside products and services can, in their own words, be "fundamentally disruptive" to the company's smartphone monopoly. Such offerings can reduce user reliance on Apple and the iPhone, while heightening competitive pressure on the company. As a result, Apple is willing to engage in anticompetitive conduct, such as the conduct set forth *infra*, when doing so helps preserve its dominant market position in the mobile operating system market.

33.     Apple's conduct here mirrors the exclusionary practices that formed the basis of the government's successful monopolization case against Microsoft two decades ago. Just as Microsoft sought to neutralize cross-platform middleware that threatened Windows' dominance, Apple has now targeted Camo's cross-platform functionality to preserve its own mobile OS monopoly.

## JURISDICTION AND VENUE

34.     This Court has subject matter jurisdiction over Reincubate's Sherman Antitrust Act claims pursuant to 28 U.S.C. §§ 1331 and 1337(a) because those claims are federal claims that arise under the Sherman Antitrust Act, 15 U.S.C. § 2.

35.     This Court has subject matter jurisdiction over Reincubate's patent infringement claims pursuant to 28 U.S.C. §§ 1331 and 1338(a), because those claims are federal claims that arise under the Patent Act, 35 U.S.C. §§ 1 *et seq*.

36.     The Court has personal jurisdiction over Apple, and venue is proper in this District

under 15 U.S.C. § 22 because Apple transacts business and is found within this District. Indeed, Apple purposefully directed substantial business activities toward New Jersey and has engaged in anticompetitive conduct causing foreseeable harm within the State of New Jersey. Apple regularly transacts business in New Jersey, derives substantial revenue from goods and services sold to consumers and businesses in New Jersey, and maintains continuous and systematic contacts with the state, including through the sale and distribution of iPhones, iPads, Mac computers, Apple Watches, and related software and services. Apple also operates retail stores, employs personnel, and provides marketing, customer-service, warranty, and technical-support services throughout New Jersey.

37.    Apple operates several company-owned retail stores in New Jersey[10], including locations at:

- Garden State Plaza, One Garden State Plaza, Paramus, NJ 07652;
- The Mall at Short Hills, 1200 Morris Turnpike, Short Hills, NJ 07078;
- Menlo Park Mall, 55 Parsonage Road, Edison, NJ 08837;
- Bridgewater Commons, 400 Commons Way, Bridgewater, NJ 08807;
- Willowbrook Mall, 1400 Willowbrook Blvd, Wayne, NJ 07470;
- Cherry Hill Mall, 2000 NJ-38, Cherry Hill, NJ 08002;
- Freehold Raceway Mall, 3710 U.S. Route 9, Freehold, NJ 07728;
- Rockaway Townsquare, 301 Mt. Hope Ave, Rockaway, NJ 07866; and
- The Pier at Caesars, One Atlantic Ocean, Atlantic City, NJ 08401.

These retail stores are owned and operated directly by Apple, Inc.—not by franchisees or independent dealers. The stores are staffed by Apple employees, display Apple signage, maintain Apple inventory, process transactions through Apple's systems, and are subject to Apple's corporate policies and operational control. These stores constitute Apple's own places of business in New Jersey for which Apple is directly responsible. Thus, this Court has personal jurisdiction over Apple because Apple has purposefully availed itself of the privilege of conducting business within New Jersey and maintains continuous and systematic contacts with this State sufficient to satisfy constitutional due process requirements.

---

[10] Apple Store in New Jersey, OUTLETS NEW JERSEY, https://outletsnewjersey.com/apple-store-in-nj/ (last visited Jan. 25, 2026).

38.     Apple employs hundreds of personnel in New Jersey in retail, technical support, and corporate functions. Apple derives substantial revenue from New Jersey, including from the sale of iPhones, iPads, Mac computers, and related products and services. On information and belief, Apple generates hundreds of millions of dollars in annual revenue from New Jersey consumers and businesses. Apple's App Store and Services business, which is central to the anticompetitive conduct alleged herein, generates significant revenue from New Jersey residents who purchase applications, subscriptions, and in-app content through their Apple devices. Apple's restrictive Developer Program License Agreement binds developers in New Jersey who seek access to the iOS platform. Apple's anticompetitive conduct in the mobile operating system market has caused and continues to cause harm to competition affecting New Jersey consumers, developers, and businesses.

39.     Venue is further proper in this District under 28 U.S.C. §§ 1391 and 1400 because a substantial part of the events or omissions giving rise to Reincubate's claims occurred in this District, including the patent infringement described herein, and because Apple has a regular and established place of business in this District.

40.     In addition, Apple has committed acts of infringement within this District by making, using, offering for sale, and selling products that infringe the Patents-in-Suit—including iPhones, iPads, and Mac computers incorporating Continuity Camera functionality—to consumers through its retail stores in this District. Apple also offers these infringing products for sale, demonstrates their functionality, provides technical support, and induces customers to use Continuity Camera through marketing materials and in-store assistance. Each sale of an infringing product in New Jersey, and each instance of customer use induced by Apple, constitutes an act of infringement within this District.

41.     Maintaining this action in the District of New Jersey serves the interest of justice and promotes judicial efficiency. The United States Department of Justice, joined by twenty state attorneys general, has filed suit against Apple in this District alleging monopolization of the smartphone market.

## **RELEVANT FACTS**

## I.     **Apple's Violation of the Sherman Act**

A.    **Apple has a monopoly in the mobile operating system market**

42.    Section 2 of the Sherman Act prohibits the acquisition or maintenance of monopoly power through exclusionary or anticompetitive conduct. As set forth below, Apple possesses monopoly power in the relevant markets identified herein and has willfully maintained that power through exclusionary acts directed at Reincubate.

43.    On June 29, 2007, Apple's co-founder, Steve Jobs, famously unveiled the iPhone. Nearly twenty years later, in July 2025, Apple's current CEO, Tim Cook, announced that Apple had sold 3 billion iPhones since the product's launch.

44.    The iPhone has and continues to comprise high-quality hardware including but not limited to semiconductor chipsets, cameras, and sensors. For example, Apple advertises that the iPhone 17 Pro includes an "A19 Pro" chip with 6-core GPU with three 48 megapixel cameras, including a wide "Fusion" camera, a "Fusion Ultrawide" camera, and a "Fusion Telephoto" camera. But the iPhone's key feature is its mobile operating system, iOS.

45.    A 2020 investigation into the competition in digital markets (the "House Report"), spearheaded by a Congressional Subcommittee on Antitrust, Commercial and Administrative Law provides a succinct, general overview of mobile operating systems (also referred to herein as "mobile OSs"):

> A mobile operating system (OS) provides a mobile device with its underlying functionality, such as user interface, motion commands, button controls, and facilitates the operation of the device's features, such as the microphone, camera, and GPS. The mobile OS is the interface between the mobile device hardware, such as the smartphone handset or tablet, and the applications that run on the device, like email or streaming apps. The mobile OS is pre-installed on mobile devices; an alternative mobile OS cannot be installed or substituted. The characteristics of the mobile OS determine aspects of the mobile device's performance and functionality, including the app stores and apps that can run on the device. The mobile OS also determines which company's ecosystem of products and services the device is integrated with.[11]

46.    Thus, like a car engine, much of a mobile operating system is invisible to users. But it operates under the hood and facilitates the user experience on mobile devices, such as the Apple

---

[11] H.R. Comm. on the Judiciary, 117th Cong., Investigation of Competition in Digital Markets (Comm. Print 2020) at 100, https://www.govinfo.gov/content/pkg/CPRT-117HPRT47832/pdf/CPRT-117HPRT47832.pdf (the "House Report").

iPhone and iPad.

47.    Mobile operating systems are distinct from, and not reasonably interchangeable with, personal computer operating systems. This is at least evidenced by the fact that mobile OS providers often provide a *separate* personal computer operating system. For example, Google offers Chrome OS for personal computers and Android for mobile smartphones. Apple does the same, offering macOS for personal computers and iOS for iPhones.

48.    The relevant geographic market for mobile OS is the United States. Significant barriers separate the mobile OS markets of different countries, including variations in cellular network access, regulatory regimes, and country-specific social norms. Network effects also operate primarily within national boundaries: for most users, the vast majority of meaningful connections—friends, family, and other personal contacts—are located in the same country. As a result, users in the United States predominantly interact with other users in the United States. For these users, a mobile OS that lacks popularity in the United States is not a reasonable substitute for one that is widely adopted domestically, even if it enjoys substantial popularity abroad. Industry participants, including Apple, recognize these market distinctions and track their own performance, as well as that of competitors, on a country-by-country basis.

49.    In the United States, two mobile operating systems—Apple's iOS and Google's Android—account for nearly 100% of the mobile operating system market. At nearly all times from 2012 through 2019, iOS encompassed more than 50% of the mobile OS market in the United States—sometimes commanding over 60%:



**Market Share of Mobile Operating Systems in the U.S.**

50.     iOS market share has only gone up since 2019. Current data suggests that the iPhone encompasses over 65% of the U.S. smartphone market. Given that all iPhones are preloaded with iOS and that all iPads are preloaded with iPadOS—a variant of iOS—it follows that iOS currently encompasses well over 65% of the mobile OS market. Courts within the Third Circuit  have held that a defendant has significant market share supporting an inference of monopoly power if the defendant possesses sixty percent or more market share in the relevant market."[12] In light of this, a Court in this District held that the United States adequately alleged Apple maintains a monopoly in the smartphone market where it alleged that Apple maintains a market share of 65%.[13]

51.     There are significant barriers to entry in the mobile OS market:

One former mobile OS competitor observed that its experience showed that it was

---

[12] *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (C.A.3 (N.J.), 2007); *see also Royal Mile Co., Inc. v. UPMC*, 2013 WL 5436925, at *30–31 (W.D.Pa.,2013) (collecting Third Circuit cases).
[13] *United States of America, et al. v. Apple Inc.*, No. 2:24-cv-04055 (JXN-LDW), at United States District Court for the District of New Jersey (filed Mar. 21, 2024), Order on MTD, ECF No. 283 at 17–20.

doubtful that a new, competitive mobile OS will emerge in the U.S. Another former mobile OS provider explained that it exited the market after concluding "the market for mobile operating systems was too established for a new entry." To compete, a new OS must offer a superior product packaged in an attractive handset, as well as a fully realized suite of apps and compatible devices comparable to what Apple and Google (and Google's hardware partners) currently offer. Industry experts have testified before the Subcommittee that the "reality is that it would be very difficult for a new mobile phone operating system today" to compete with Apple and Google, "even if it offered better features." Investment analysts agree, noting it is likely Android and iOS "will continue to power nearly every smartphone around the world in the long run."[14]

52.     Thus, mobile OS within the United States is a relevant product market.

53.     Apple exercises complete control over its mobile operating system, iOS, and over the interoperability of its broader ecosystem of devices and operating systems, including macOS (for its computers), iPadOS (for its tablets), watchOS (for its watches), tvOS (for its digital media player), and visionOS (for its spatial computer). This control enables Apple to dictate how—and whether—its devices communicate with one another and with competing platforms. By tightly integrating its products while restricting interoperability with non-Apple devices, Apple maintains its dominance in the U.S. smartphone market and leverages that dominance to entrench its positions in adjacent markets, including laptops, tablets, and smartwatches.

54.     iPadOS is a specialized version of iOS designed specifically for iPads. Collectively, iOS, iPadOS, watchOS, tvOS, and visionOS are referred to herein as "Apple's Mobile OS." Apple's Mobile OS consists of the software that manages smartphones, tablets, and other mobile devices' hardware.

55.     As detailed below—and as numerous lawsuits and government enforcement actions have likewise alleged—Apple has erected and maintained barriers to competition to preserve its monopoly power in the U.S. mobile operating systems market through iOS. In *United States v. Apple Inc.*, the Department of Justice and several states alleged that Apple used contractual and technical restrictions to block interoperability with non-Apple devices and services.[15] Private actions, including *Epic Games v. Apple, Cydia v. Apple*, and *AliveCor v. Apple*,

---

[14] House Report at 104.

[15] *United States of America, et al. v. Apple Inc.*, No. 2:24-cv-04055 (JXN-LDW), at United

have similarly accused Apple of using its control over iOS to exclude rival app stores, payment systems, and health technologies. As another example, Affinity Credit Union accused Apple of preventing competitors from accessing the NFC interface on Apple smartphones that would be needed to compete with Apple Pay. Complaint, *Affinity Credit Union v. Apple Inc*., No. 3:22-cv-04174 (N.D. Cal. July 18, 2022). These suits collectively underscore Apple's systematic use of iOS to foreclose competition and reinforce its monopoly power.

**B.    Apple maintains monopoly power through anticompetitive conduct**

**i.    Apple's iOS**

56.    At its core, iOS includes an aggregation of features—a comprehensive combination of functionalities that deliver a cohesive mobile operating environment.

57.    For example, user interface and experience features, such as Messages, allow users to add text effects such as bold, italic, underline, and strikethrough to emphasize messages, or apply animated effects to any letter, word, phrase, or emoji:

---

States District Court for the District of New Jersey (filed Mar. 21, 2024), Order on MTD, ECF No. 283 at 21–24.



58.    Security and privacy features, such as "Sign In With Apple," allow users to create and share a random email address that forwards to a personal email address. Thus, users may receive messages from applications *without* having to share their personal email address:



59.    Cross-Device integration features, such as "Continuity Camera," introduced in 2022 in response to Reincubate's Camo product, as detailed *infra*, allow users to use their iPhone

-18-

as a webcam for their Mac device, wirelessly and in real-time:



60. These and other iOS features contribute to what is commonly referred to as "iOS stickiness"—the concept that the iOS ecosystem keeps users engaged, loyal, and unlikely to switch to other mobile operating systems—namely Android.

61. As noted above, Apple exercises complete control over its mobile operating system, iOS, and over the interoperability of its broader ecosystem of devices and operating systems, including macOS (for its computers), iPadOS (for its tablets), watchOS (for its watches), tvOS (for its digital media player), and visionOS (for its spatial computer). This control enables Apple to dictate how—and whether—its devices communicate with one another and with competing platforms. By tightly integrating its products while restricting interoperability with non-Apple devices, Apple maintains its dominance in the U.S. smartphone market and leverages that dominance to entrench its positions in adjacent markets, including laptops, tablets, and smartwatches.

62. iOS stickiness has and continues to be a primary goal of Apple. Indeed, as early as 2010, Steve Jobs was discussing how to "further lock customers into our ecosystem" and "make

Apple['s] ecosystem even more sticky."[16]

63.    Numerous plaintiffs have attributed iOS stickiness to Apple's refusal to provide cross-platform functionality between iOS and Android.

64.    Consistently distinguishing iOS from Android is evidently expensive. Acknowledging this fact, Apple's Vice President of Product Marketing stated, "**anything new and especially expensive needs to be rigorously challenged before it's allowed into the consumer phone.**"

65.    However, Apple's problem is that it surreptitiously delegates "rigorously challeng[ing]" new features to third-party software developers. Apple induces and encourages these developers to spend time and money researching and developing software applications. Should these applications be given the thumbs up by the invisible hand of the market, Apple incorporates them directly into the latest version of iOS as "new" features, thus preserving user satisfaction with iOS and in turn Apple's Mobile OS monopoly. That is exactly what happened to Reincubate.

66.    In October 2020, the U.S. House of Representatives Subcommittee on Antitrust, Commercial, and Administrative Law issued its Investigation of Competition in Digital Markets: Majority Staff Report and Recommendations ("2020 House Antitrust Report"), a 449-page report following a sixteen-month bipartisan inquiry into the business practices of major technology platforms, including Apple. The report concluded that Apple exercises monopoly power over software distribution on iOS devices through its control of the App Store and uses that control to extract supra-competitive commissions, suppress competition, and disadvantage rival developers. It identified Apple's dual role as both platform operator and competitor as a structural conflict of interest that enables exclusionary conduct and self-preferencing—practices that harm innovation, raise consumer prices, and erode competition in digital markets.

67.    The 2020 House Report made the following findings regarding Apple's monopoly power:

> Apple has significant and durable market power in the mobile operating system market. Apple's dominance in this market, where it controls the iOS mobile

---

[16] *United States of America, et al. v. Apple Inc.*, No. 2:24-cv-04055 (JXN-LDW), at United States District Court for the District of New Jersey (filed Mar. 21, 2024), ECF No. 1 at 6.

operating system that runs on Apple mobile devices, has enabled it to control all software distribution to iOS devices. As a result, Apple exerts monopoly power in the mobile app store market, controlling access to more than 100 million iPhones and iPads in the U.S.

Apple's mobile ecosystem has produced significant benefits to app developers and consumers. Launched in 2008, the App Store revolutionized software distribution on mobile devices, reducing barriers to entry for app developers and increasing the choices available to consumers. Despite this, Apple leverages its control of iOS and the App Store to create and enforce barriers to competition and discriminate against and exclude rivals while preferencing its own offerings. Apple also uses its power to exploit app developers through misappropriation of competitively sensitive information and to charge app developers supra-competitive prices within the App Store. Apple has maintained its dominance due to the presence of network effects, high barriers to entry, and high switching costs in the mobile operating system market.

Apple is primarily a hardware company that derives most of its revenue from sales of devices and accessories. However, as the market for products like the iPhone have matured, Apple has pivoted to rely increasingly on sales of its applications and services, as well as collecting commissions and fees in the App Store. In the absence of competition, Apple's monopoly power over software distribution to iOS devices has resulted in harms to competitors and competition, reducing quality and innovation among app developers, and increasing prices and reducing choices for consumers. [17]

Apple has significant and durable market power in the market for mobile operating systems and mobile app stores, both of which are highly concentrated. Apple's iOS mobile operating system is one of two dominant mobile operating systems, along with Google's Android, in the U.S. and globally. Apple installs iOS on all Apple mobile devices and does not license iOS to other mobile device manufacturers. More than half of mobile devices in the U.S. run on iOS or iPadOS, an iOS derivation for tablets introduced in 2019. Apple's market power is durable due to high switching costs, ecosystem lock-in, and brand loyalty. It is unlikely that there will be successful market entry to contest the dominance of iOS and Android.

As a result, Apple's control over iOS provides it with gatekeeper power over software distribution on iOS devices. Consequently, it has a dominant position in the mobile app store market and monopoly power over distribution of software applications on iOS devices.

Apple's App Store is the only method to distribute software applications on iOS devices. It does not permit alternative app stores to be installed on iOS devices, nor does it permit apps to be sideloaded. As discussed earlier in this Report, consumers have a strong preference for native apps to web apps, and Apple has acknowledged

---

[17] House Report at 16–17 (internal citations omitted).

key differences between them. Developers have explained that Apple actively undermines the open web's progress on iOS "to push developers toward building native apps on iOS rather than using web technologies." As a result, Apple's position as the sole app store on iOS devices is unassailable. Apple fully controls how software can be installed on iOS devices and CEO Tim Cook has explained that the company has no plan to permit an alternative app store. The former director of the app review team for the App Store observed that Apple is "not subject to any meaningful competitive constraint from alternative distribution channels."

In response to these concerns, Apple has not produced any evidence that the App Store is not the sole means of distributing apps on iOS devices and that it does not exert monopoly power over app distribution. Apple says it does not create—nor is it aware of third-party data—that tracks market share in the app distribution market. Apple claims the App Store competes in a larger software distribution market that includes other mobile app stores, as well as the open internet, personal computers, gaming consoles, smart TVs, and online and brick-and-mortar retail stores. While consumers can access software and developers can distribute software through those platforms, none of those platforms permit consumers to access apps on an iOS device, or for developers to distribute apps to iOS devices.

Apple's monopoly power over software distribution on iOS devices appears to allow it to generate supra-normal profits from the App Store and its Services business. Apple CEO Tim Cook set a goal in 2017 to rapidly double the size of the Services business by the end of 2020. Apple met this goal by July 2020, six months ahead of schedule. The Services business accounted for nearly 18% of total revenue ($46.2 billion) in fiscal year 2019. Services grew faster than Products in recent years, increasing by more than 41% since 2017. The Services category is also Apple's highest margin business at 63.7% in fiscal year 2019 and 67.2% for Apple's quarter ending in June 2020.



Annual Revenue by Segment[2120]

18

In addition to investigating whether Apple abuses its monopoly power over app distribution to leverage high commissions and fees from app developers, Subcommittee also examined whether Apple abuses its role as iOS and App Store owner to preference its own apps or harm rivals. The Committee requested information regarding Apple's practice of locking-in Apple's apps as defaults on the iPhone, and Subcommittee Chairman Cicilline requested information from Apple regarding its practice of preinstalling its own apps on the iPhone. Subcommittee Chairman Cicilline also sought input on whether Apple's policy of reserving certain application programing interfaces (APIs) and access to certain device functionalities for its apps gives Apple's services a competitive advantage.

It is widely understood that consumers usually do not change default options. This is the case "even if they can freely change them or choose a competitive alternative." Subcommittee staff reviewed communications between Apple employees that demonstrate an understanding inside Apple that pre-loading apps could be advantageous when competing against third-party apps.

Apple pre-installs about 40 Apple apps into current iPhone models. Several of these apps are set as defaults and are "operating system apps" that are "integrated into the phone's core operating system and part of the combined experience of iOS and iPhone." According to Apple, users can delete most of these pre-installed apps. Apple does not pre-install any third-party apps, and until the September 2020 release of iOS 14, it did not allow consumers to select third-party web browser or email apps as defaults. Apple says that it is making "more than 250,000 APIs available to developers in iOS 14."

A report by the Netherlands Authority for Consumers and Markets (ACM) on mobile app stores recently observed that app providers believe they "have a strong disadvantage" when competing with Apple's apps due to the fact that those services

---

[18] House Report 333–336 (internal citations omitted).

are often pre-installed on iOS devices. The study also noted that "pre-installation of apps can create a so-called status-quo bias. Consumers are more likely to use the apps that are pre-installed on their smartphones." Consumers will download apps that compete with pre-installed apps only when there is a noted quality difference, and even then, lower-quality pre-installed apps will still enjoy an advantage over third-party apps. The European Commission's 2019 report on competition in digital markets explained that privileging access to APIs can provide an advantage to those with greater access over those with more innovative products. Public Knowledge concluded that Apple's control of iOS and the App store enables it to advantage its own apps and services by pre-installing them on iOS devices, leading consumers to rely on the preinstalled apps rather than looking for alternatives in the App Store.

Mobile operating system providers develop APIs to permit apps to access a device's features, such as the microphone, camera, or GPS, or other software programs and determine what information on the device apps can access. Public APIs for iOS are made available to app developers to ensure apps are integrated with the device and function as intended. These public APIs also control the services that are opened via default when users click a link to open a webpage or an address to open a map application. Private APIs access functionality that is not publicly released. Apple is permitted to use the private APIs on iOS devices, but third-party developers are not.

Apple's public APIs default to Apple's pre-installed applications. As a result, when an iPhone user clicks on a link, the webpage opens in the Safari Browser, a song request opens in Apple Music, and clicking on an address launches Apple Maps. With some recent exceptions, iPhone users are unable to change this default setting; however they are able to send app-specific links from inside many popular apps. For example, a person can share a link to a song in a third-party music streaming app such that it would open that song in the same app if it is already downloaded on the recipient's smartphone. One app developer has argued, however, that Apple uses its control over iOS to give its own apps and services advantages that are not available to competitors. For example, the developer explained that for years it was barred from integrating with Siri, Apple's intelligent virtual assistant that is built into Apple devices. Although Siri can now integrate with the app, users must explicitly request Siri launch the third-party app, otherwise it will default to launch Apple's service.

Like setting advantageous defaults and pre-installing its own apps, **Apple is also able to preference its own services by reserving access to APIs and certain device functionalities for itself.** ACM and technology reporters have both noted that "private APIs have the potential to give Apple apps a competitive advantage," and that "Apple has for a long time favored its own services through APIs." For example, from the release of iOS 4.3 until iOS 8, "third-party developers had to rely on the UIWebView API to render web pages in iOS apps, while Apple gave its own apps access to a private, faster API," and as a result, "Google's mobile version of Chrome for iOS could not compete with Apple's mobile version of Safari in terms of speed."

-24-

. . . .

In January 2020, Kirsten Daru, Chief Privacy Officer and General Counsel of Tile offered testimony to Subcommittee about this dynamic. Tile is a company that makes hardware and software that helps people find lost items. Tile testified that for years it successfully collaborated with Apple. However, in 2019 reports surfaced that Apple planned a launch a hardware product to compete with Tile. In her testimony, Ms. Daru said that Apple's 2019 release of iOS 13 harmed Tile's service and user experience while simultaneously introducing a new pre-installed Apple finder app called Find My. Changes to iOS 13 made it more difficult for Tile's customers to set up the service, requiring several confusing steps to grant Tile permission to track the phone's location. Meanwhile, Apple's Find My app was pre-installed on iOS devices and activated by default during iOS installation. Users are unable to opt out of Find My's location tracking "unless they go deep into Apple's labyrinthine menu of settings." Tile's response to the Subcommittee's Questions for the Record included detailed location permission flow comparisons between Tile and Find My. Tile explained that as a result of Apple's changes to iOS 13 it saw significant decreases in users and a steep drop off in users enabling the proper settings on iOS devices.[19]

In addition to investigating allegations Apple engages in self-preferencing in the App Store, the Committee sought information regarding whether Apple exploits third-party developers that rely on distribution in the App Store. Developers have alleged that Apple abuses its position as the provider of iOS and operator of the App Store to collect competitively sensitive information about popular apps and then build competing apps, or integrate the popular app's functionality into iOS. The practice is known as "Sherlocking." The antitrust laws do not protect app developers from competition, and platforms should continue to innovate and improve their products and services. However, Sherlocking can be anticompetitive in some instances.

Some app developers have complained that Apple leverages its control of iOS and the App Store to glean business intelligence that enables it to better compete against third-party apps. For example, after a stress relief app called Breathe was Sherlocked in 2016, the app's developers said that Apple used third-party developers "as an R&D arm." The Washington Post reported on the phenomenon, explaining: "Developers have come to accept that, without warning, Apple can make their work obsolete by announcing a new app or feature that uses or incorporates their ideas. Some apps have simply buckled under the pressure, in some cases shutting down. They generally don't sue Apple because of the difficulty and expense in fighting the tech giant—and the consequences they might face from being dependent on the platform."

. . . .

---

[19] House Report at 351–357 (internal citations omitted, emphasis added).

In response to the requests for information, Match Group, Inc. told the Subcommittee that Apple has a history of "closely monitoring the success of apps in the App Store, only to copy the most successful of them and incorporate them in new iPhones" as a pre-installed app. Phillip Shoemaker, former director of app review for the App Store, similarly told Subcommittee staff that during his time at Apple an app developer proposed an innovative way to wirelessly sync the iPhone and Mac. The app did not violate any of Apple's Guidelines, but it was rejected from the App Store nonetheless. Apple then appropriated the rejected app's feature for its own offerings.

During the Subcommittee's sixth hearing, Rep. Neguse asked Mr. Cook about Tile's testimony. In particular, he asked if Apple has access to the confidential information of app developers, and whether Apple's Developer Agreement explicitly authorizes Apple to use developers' information to build apps to compete against them. Mr. Cook's answer was non-responsive regarding allegations of Sherlocking. Instead, he said that Apple does not violate other companies' intellectual property rights.

In contrast, Apple co-founder and former CEO Steve Jobs once noted that "[w]e have always been shameless about stealing great ideas." The Apple Developer Agreement, which Apple requires every app developer to agree to, appears to warn developers that in exchange for access to the App Store, Apple is free to build apps that "perform the same or similar functions as, or otherwise compete with" apps in the App Store. Additionally, "Apple will be free to use any information, suggestions or recommendations you provide to Apple pursuant to this Agreement for any purpose, subject to any applicable patents or copyrights." [20]

During the Subcommittee's sixth hearing, Representatives Val Demings (D-FL) and Lucy McBath (D-GA) asked questions regarding Apple's conduct in 2018 and 2019 removing parental control apps from the App Store. In 2018, Apple announced its Screen Time app, a new feature bundled with iOS 12 that helped iOS users limit the time they and their children spent on the iPhone. Thereafter, Apple began to purge many of the leading rival parental control apps from the App Store. Apple explained the apps were removed because they used a technology called Mobile Device Management (MDM). The MDM technology allowed parents to remotely take over their children's phones and block content. Apple noted that MDM could allow the app developer to access sensitive content on the device.

. . . .

Here, Apple's monopoly power over app distribution enabled it to exclude rivals to the benefit of Screen Time. Apple could have achieved its claimed objective—protecting user privacy—through less restrictive means, which it ultimately did only after significant outcry from the public and a prolonged period of harm to rivals. Apple's conduct here is a clear example of Apple's use of privacy as a sword

---

[20] House Report at 361–363 (internal citations omitted, emphasis added).

to exclude rivals and a shield to insulate itself from charges of anticompetitive conduct. [21]

68.     In recent years, Apple has faced mounting allegations of anticompetitive conduct consistent with the exclusionary pattern alleged here. For example, the Department of Justice sued Apple in March 2024 for maintaining its dominance in the U.S. smartphone market, alleging Apple restricted cross-platform interoperability, favored its own hardware and services, impeded switching between platforms, and imposed barriers on rival apps and developers.

69.     As another example of Apple's recent history of anticompetitive conduct, a federal judge recently found that Apple willfully violated a prior antitrust injunction. That antitrust injunction, arising out of Epic Games lawsuit against Apple, required Apple to permit alternative payment methods in its App Store. Apple purposefully ignored the order and continued and even doubled down on its restrictive practices "with the express intent to create new anticompetitive barriers."

70.     The 2020 House Report also found as follows: "In 2010, Apple settled charges it had conspired to fix employees' wages. Two years later, Apple was found guilty of orchestrating a price-fixing conspiracy. In that case, the presiding judge stated that the record 'demonstrated a blatant and aggressive disregard' by Apple 'for the requirements of the law,' noting that the conduct 'included Apple lawyers and its highest-level executives.'" [22]

71.     Even when subject to a binding federal injunction prohibiting anticompetitive anti-steering conduct, Apple chose to pursue **the most anticompetitive path available** and then attempted to obscure that conduct and the decision-making process that led to it from the Court.[23] After the district court enjoined Apple from restricting developers' ability to direct users to alternative purchasing mechanisms, Apple responded by imposing a prohibitive 27% commission on external purchases and by layering design, placement, and warning requirements deliberately engineered to deter users and render external purchase options economically and practically nonviable. *Id*. The district court found that Apple **willfully violated** both the letter and the spirit of the injunction, concealed its true decision-making, and acted in bad faith, and it therefore held Apple in civil contempt and imposed sanctions. *Id*. On appeal, the United States Court of Appeals

---

[21] House Report at 364–367 (internal citations omitted, emphasis added).
[22] House Report at 75.
[23] *Epic Games, Inc. v. Apple Inc*., 2025 WL 3548683, at *1–23 (9th Cir. Dec. 11, 2025).

for the Ninth Circuit affirmed the contempt findings and Apple's liability for violating the injunction, rejecting Apple's efforts to recast its conduct as good-faith compliance, and upheld the sanctions in substantial part, reversing only to require that any remedial commission framework be narrowly tailored and purgeable rather than punitive. *Id.* Apple's defiance of judicial authority was so pronounced that, on appeal, Apple asked the Ninth Circuit to remove the district judge who found it in contempt, a request the court rejected outright, holding that adverse rulings and findings of bad faith do not constitute the "rare and extraordinary circumstances" required for reassignment. *Id*.

72.     Beyond the United States, Apple is also subject to global scrutiny: regulators in the European Union, Japan, Turkey and other jurisdictions are investigating or penalizing Apple for using its iOS-ecosystem control to foreclose competition, block alternative app stores or payment systems, and leverage its operating-system dominance into adjacent markets.[24] Across the EU and in the UK, Apple has been confronted with significant private individual and class action litigations over its anticompetitive conduct in connection with the App Store.[25]

---

[24] Ryan Browne, Apple Hit With More Than €1.8 Billion EU Antitrust Fine Over Music-Streaming Practices, CNBC (Mar. 4, 2024), https://www.cnbc.com/2024/03/04/apple-hit-with-more-than-1point95-billion-eu-antitrust-fine-over-music-streaming.html; Commission Staff Working Document, Report on the Implementation of the DMA, SWD (2025) 166 final (Mar. 14, 2025), https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX:52025DC0166; (designated as a gatekeeper with respect to its core platform service iPadOS and for iMessage); Press Release, Apple Inc., Japan Fair Trade Commission Closes App Store Investigation (Sept. 1, 2021), https://www.apple.com/newsroom/2021/09/japan-fair-trade-commission-closes-app-store-investigation/; Victoria Van Campen, Japan's Mobile Software Competition Act Grows Its Guidelines, Wolters Kluwer: Competition Law Blog (Jan. 17, 2024), https://legalblogs.wolterskluwer.com/competition-blog/japans-mobile-software-competition-act-grows-its-guidelines/; Digital Policy Alert, Announced: Competition Authority's Investigation into Apple Over Its App Store Payment Systems; Alleged Violation of Law on the Protection of Competition (Mar. 30, 2023), https://digitalpolicyalert.org/event/20453-announced-competition-authoritys-investigation-into-apple-over-its-app-store-payment-systems-alleged-violation-of-law-on-the-protection-of-competition; Steve Costello, Korea Targets Google, Apple for In-App Payment Breaches, Mobile World Live (Apr. 2, 2024), https://www.mobileworldlive.com/regulation/korea-targets-google-apple-for-in-app-payment-breaches/; Paul Sandle, Apple Loses U.K. Lawsuit Over App Store Commissions, Reuters (Oct. 23, 2025), https://www.reuters.com/sustainability/boards-policy-regulation/apple-loses-uk-lawsuit-over-app-store-commissions-2025-10-23/; Cleary Gottlieb Steen & Hamilton LLP, French Competition Authority Fines Apple €150 Million for Abusive Implementation of Privacy Framework, Cleary Antitrust Watch (Apr. 2, 2025), https://www.clearyantitrustwatch.com/2025/04/french-competition-authority-fines-apple-e150-million-for-abusive-implementation-of-privacy-framework/.

[25] *Dr. Rachael Kent v. Apple Inc. & Apple Distribution Int'l Ltd*, [2025] CAT 67 (Competition Appeal Tribunal Oct. 23, 2025), https://www.catribunal.org.uk/sites/cat/files/2025-

73. These recent events underscore the relevance of Apple's conduct in this case. They demonstrate a corporate strategy of systematic control rooted in Apple's vertical integration of hardware, iOS, the App Store and related services. That same strategy is displayed in Apple's actions toward Reincubate's Camo: Apple leveraged its operating-system dominance, restricted interoperability, and substituted its own feature (Continuity Camera) for Camo's cross-platform offering, thereby preserving its monopoly power by foreclosing competitive alternatives that would have allowed interoperability with Android devices.

74. In 2020, frustrated by low-quality video conferencing options, the Reincubate team began to conceptualize a novel idea: a software that allows users to utilize their phone camera as a professional quality webcam for a computer.

75. On July 16, 2020, Reincubate launched "Camo," vastly improving the video quality of webcams for video calls, recordings, streaming, and content creation, by leveraging the superior cameras found in modern smartphones.

76. Today, Camo is supported by all major video conferencing, recording, and streaming apps, including Zoom, Meet, Teams, Skype, Slack, Google Chrome, Safari, FaceTime, Cisco Webex, and more.

77. At a high-level, Camo works as follows: users install Camo Studio onto their computer, such as a Mac, and they install the Camo Camera App onto their phone, such as an iPhone or any Android phone. The computer and the phone connect via USB cable or Wi-Fi. Camo Studio installs a "virtual" camera on the user's computer, and applications such as Zoom see "Camo Camera" as another webcam. The phone camera then captures live video using its native camera hardware and streams the compressed video feed to the computer via USB or Wi-Fi:

---

12/14037721%20Dr.%20Rachael%20Kent%20v%20Apple%20Inc.%20and%20Apple%20Distri bution%20International%20Ltd%20- %20%20Judgment%20%5B2025%5D%20CAT%2067%23%20Oct%202025.pdf; *Apple Can Be Sued in Dutch Court for Antitrust Damages, EU's Top Court Says*, Channel News Asia (July 25, 2023), https://www.channelnewsasia.com/business/apple-can-be-sued-in-dutch-court-antitrust-damages-eus-top-court-says-5527651; *Apple Hit With App Store Antitrust Suit From Privacy Firm Proton*, Bloomberg L. (June 30, 2023), https://news.bloomberglaw.com/litigation/apple-hit-with-app-store-antitrust-suit-from-privacy-firm-proton.



78.     Camo allowed for reliable, low-latency, high quality, native, seamless and "driverless" use of a smartphone camera as a webcam.

79.     Roughly a month before Camo's July 16, 2020 launch, Reincubate was introduced to Apple's Worldwide Developer Relations Team.

80.     According to Apple, the Worldwide Developers Relations ("WWDR") Team "provide[s] the services, resources, and mentorship that enable the world's most dynamic developer community to stretch the limits of their imaginations and bring the next big app idea to Apple's platforms to customers across the globe."

81.     Reincubate's initial communications with the WWDR team focused on making Camo compatible with Apple applications, such as FaceTime and Safari, as well as making Camo available on the "Apple App Store" and the "Apple Mac App Store." Members of the WWDR team monitored Camo and participated in its beta before public launch, joining Reincubate on calls and encouraging the company to invest heavily in Camo.

82.     On June 21, 2020, Reincubate CEO, Aidan Fitzpatrick was introduced to the WWDR Partnership Manager for the UK & Ireland, SiQuing Lin. The next day, Mr. Fitzpatrick emailed Ms. Lin, "iPhones have amazing cameras, whereas built-in and third-party webcams aren't amazing. Camo lets people use any iOS device as a webcam, so that they can look amazing." Ms. Lin responded, "The app concept is super smart, very cool…do you have any technical questions, especially anything to do with iOS 14?"

83.     From there, Apple immediately recognized the potential of Camo's technology and actively induced and encouraged Reincubate to further develop and market Camo for the iOS platform. Indeed, less than a month after Mr. Fitzpatrick's initial email to Ms. Lin, and two days before Camo's July 16, 2020 launch, Mr. Fitzpatrick received the following email from WWDR's Photo & Video Manager, Roland Wood:

> Congrats on finally getting Camo into broader testing. I manage the Photo/Video segments for Worldwide Developer Relations at Apple as well as all camera manufacturers. **I've been looking for a developer that was working on utilizing the iPhone cameras and APIs for webcam usage. You might have done it as it seems**. So to get your app all the support it needs, I'd like to offer up better **access to our team to make sure Camo looks and behaves the best it can for launch**.

84.     In or around October 2020, Apple employees listed Camo on the Apple App Store's "Apps we Love."

85.     On April 27, 2021, an Apple iPhone Engineer named Vitor Silva[26] emailed Mr. Fitzpatrick, "I have been using [Camo] with Webex and love it! Making it known internally too as I look better than everyone, ha."

86.     On April 30, 2021, WWDR team member Raul Basurto Rosenzweig emailed Mr. Fitzpatrick, "I've started using [Camo] daily since my M1 Mac mini arrived last year."

87.     In July 2021, Apple employees who work on Apple University—Apple's internal training and professional-development program for educating and developing Apple employees—purchased multiple Camo licenses.

88.     As Camo continued to grow in popularity both within and without Apple, Reincubate continued to test and ship Camo updates with Apple's encouragement. For example, on June 8, 2021, Mr. Fitzpatrick emailed WWDR team member Raul Basurto Rosenzweig, "Just a short note of appreciation. Loved WWDC. Still exploring the APIs & there's some neat stuff for us that we're going to be getting out in advance of Sept." Mr. Basurto Rosenzweig responded, "Let me know what neat stuff you have in the pipeline, **especially for the new stuff**!"

89.     Roughly a month later, Ms. Lin emailed Mr. Fitzpatrick, "**please do let me know**

---

[26]Vitor Silva is currently listed as iPhone Product Manager, Worldwide Product Marketing at Apple on linkedin.

**if you plan to ship any new features either with our iOS 15 launch** or slightly later in the fall", thus further inducing Reincubate to keep developing Camo.

90.     Then on July 20, 2021, Ms. Lin emailed Mr. Fitzpatrick again, "Thanks for the update on your iOS 15 plans. I realise that we never actually 'met' face to face. Would you be up for a VC intro (re-intro?) meeting in the next few weeks? **I can tell you a bit more about what Apple Developer Relations do and how we can help you**, and would love to get a deeper understanding of your product and roadmap."

91.     As a result, Reincubate continued to devote significant time, money, and resources into "rigorously challenging" new Camo updates.

92.     On information and belief, at least 2% of Apple employees worldwide have used Camo.  This amounts to thousands of people across all parts of Apple, including a number of Senior Directors, engineering managers, product designers, industrial designers, video producers, retail staff and other team members across a broad range of segments. Apple's enterprise and education sales teams across multiple regions have used Camo to sell Apple devices. Apple even requested a company-wide discount—which was provided and which Apple used—and made various feature requests.

93.     Evidently, Camo passed the challenge. On August 2, 2021, the iOS userbase signaled its love for Camo as the App was featured as the "App of the Day" on Apple's App store:



**Not a fan** of camera-on video calls? *Camo* could change that. It turns your iPhone or iPad into a pro-level HD webcam for Mac and Windows. The advanced editing tools will ensure you – and your background – look tip-top onscreen.

**What we love:** The app leverages your device's existing camera so you don't need to buy an expensive external webcam, and no additional software drivers are required. Plus it's compatible with most video-call platforms and apps, including *Zoom*, *Microsoft Teams*, *Meet* and *Slack*.

94.     Accordingly, Camo's launch was a strong success, with good traction amongst the great and good of the Apple ecosystem, creators, journalists, entrepreneurs, and investors.

95.     On information and belief, Apple encouraged Reincubate to continue developing Camo and to provide its "Camera Software Streaming Group" with information related to Camo's technology and marketability so that Apple could develop a competing feature limited to iPhones.

96.     As Camo continued to show commercial success, Apple quietly appointed Brad Ford to manage Apple's "Camera Software Streaming Group."

97.     On information and belief, Mr. Ford was tasked with incorporating the Camo technology directly into the iOS platform.

98.     On information and belief, Mr. Ford reviewed Reincubate patents related to the Camo technology as well as Camo itself.

99.     On June 6, 2022, Apple kicked off its Worldwide Developers Conference 2022 ("WWDC22") at its headquarters in Cupertino, California.

100.    That morning, Apple Senior Vice President, Craig Federighi, unveiled the then-latest version of iOS (iOS 16) to WWDC22 attendees:



101.    Walking across the stage, Mr. Federighi proudly unveiled iOS's latest feature:

Continuity Camera. According to Mr. Federighi, "**Now with Continuity Camera, you can use iPhone as your webcam**" and that Continuity Camera lets you "**do things that were never before possible with a webcam**."

102.    As a result, noted independent analyst Benedict Evans observed publicly that Apple had "just killed Camo," and influential blogger, designer, and long-time Apple-watcher John Gruber asked Reincubate's CEO, Aidan Fitzpatrick, whether he was "retiring to live the rest of [his] life on a beach somewhere." Upon learning that Reincubate did not plan to exit the market, Gruber added that "there's sherlocking and then there's total sherlocking, and I can't see where you guys can go." Although other press outlets and members of the technology press contacted Reincubate for comment, the company declined to provide one.

103.    "Sherlocking" is a term widely used in the technology industry to describe Apple's recurring practice of replicating the core functionality of an independent developer's product within Apple's own operating system, thereby rendering the third-party product obsolete. The term originates from Apple's early-2000s duplication of a third-party search tool called Watson after Apple integrated similar functionality into its own macOS application Sherlock 3. Over the years, developers have used "sherlocked" to describe numerous instances where Apple copied and bundled third-party features—such as screen-time tracking apps after Apple released Screen Time, password managers following iCloud Keychain, and parental-control tools supplanted by Family Sharing and Screen Time restrictions. The phrase has since become shorthand for Apple's pattern of appropriating and extinguishing innovative software developed outside its ecosystem.

104.    TechCrunch featured Camo as the first listed "Sherlocked app" from WWDC 2022.  The relevant portion of the article, available at https://techcrunch.com/2022/06/13/all-the-things-apple-sherlocked-at-wwdc-2022/ is reproduced below:

## Feature: Continuity camera

**Sherlocked app:** Camo

Apple's new continuity feature will let you use your iPhone as a webcam, which was Camo's main pitch. The iPhone-maker is partnering with Belkin to release a special mount later this year, which will hold your iPhone atop your MacBook screen. Plus, it will release an API for Continuity Camera so other apps could easily take advantage of this feature.



IMAGE CREDITS: APPLE

But Camo's not completely dead. It's available on Windows and is also compatible with Android phones. As Continuity Camera will only work with an iPhone-Mac combo, any other combinations of desktop and mobile systems will have to use Camo or an equivalent app. Plus, it could offer more video tuning features to its pro users, so they can get their money's worth.

105.    The deeply integrated Continuity Camera became another such absorbed feature that Apple uses to preserve its mobile OS monopoly:



106.    Apple's own employees instantly recognized that Apple had taken and incorporated Camo technology directly into iOS 16. Immediately after Mr. Federighi's presentation, Ms. Lin emailed Mr. Fitzpatrick:

> **I realise that one of the features that we announced today is very similar to what Camo offers, and I wanted to check in with you to see how you are feeling about that?**

107.    John Geleynse, Apple's former Director of Developer Evangelism messaged Mr. Fitzpatrick and asked to meet. They met that day, and Mr. Geleynse prodded Mr. Fitzpatrick to "ignore" the claims of "Sherlocking" on social media and "just keep building."

108.    On June 6, 2022, after Mr. Federighi's keynote, Ms. Lin informed the WWDR

Director, Shaan Pruden, that Continuity Camera copied Reincubate's technology. Ms. Lin encouraged Ms. Pruden to discuss the issue with Mr. Fitzpatrick.

109.    Nine days later, Ms. Pruden and Mr. Fitzpatrick met via Webex. Ms. Pruden then informed Mr. Fitzpatrick that it was WWDR's job to help developers "whether they compete with us or not." This is because Apple is unfazed by "competing" third-party developer applications. Rather, Apple is concerned with preserving its monopoly in the mobile OS market by utilizing technology developed by third-party developers, such as Reincubate. Indeed, Apple *relies* on these developers.

110.    During that meeting, Mr. Fitzpatrick further explained to Ms. Pruden that Reincubate had "invested substantially in a new and innovative product" and "proved the market at Apple's encouragement." Mr. Fitzpatrick further explained to Ms. Pruden that Apple's conduct signaled "to other third-party developers the risk of developing on Apple platforms."

111.    During that meeting, Mr. Fitzpatrick explained to Ms. Pruden that Camo was Reincubate's fourth product to be harmed "as a consequence of a strategic move by Apple." Ms. Pruden responded "you're amazing product people" and further informed Mr. Fitzpatrick that whatever he builds next will be great. Mr. Fitzpatrick responded that Apple would "eat" whatever he did next, so it would be hard to "wholeheartedly pursue shipping innovative features" on iOS.

112.    Ms. Pruden concluded the meeting by stating that she would be upset to see Reincubate leave the Apple developer ecosystem—presumably because Apple would lose a developer contributing to new iOS features.

113.    Apple has already acknowledged that it does not have to innovate: "In looking at it with hindsight, I think going forward we need to set a stake in the ground for what features we think are 'good enough' for the consumer. I would argue were [sic] already doing *more* than what would have been good enough."[27] After identifying old features that "would have been good enough today if we hadn't introduced [updated features] already," she explained, "**anything new and especially expensive needs to be rigorously challenged before it's allowed into the consumer phone.**"

---

[27] First Amended Complaint, United States & Plaintiff States v. Apple Inc., No. 2:24-cv-04055 (JXN-LDW) (D.N.J. June 11, 2024) (complaint available at https://www.justice.gov/d9/2024-06/423137.pdf).

114.    But because of Apple's anticompetitive conduct, third-party developers, like Reincubate, are also disincentivized from innovating. They are tasked with making the financial and personal investment of "proving the market" to Apple and Apple, in turn, reaps the rewards of every proven market.

115.    Theft and integration of Camo's technology in iOS (and macOS) was just the tip of the iceberg here.

116.    Camo has been unable to achieve smooth, low-latency Wi-Fi performance in either infrastructure or peer-to-peer modes, which were essential to its operation and interoperability between devices since the introduction of the continuity system. Apple's own Continuity subsystem uses aggressive Wi-Fi channel switching that makes macOS and iOS unsuitable for the kind of low-latency, unbuffered wireless video streaming Camo needs, a fact Apple's Developer Technical Support explicitly acknowledged. As a result, Continuity Camera retains reliable, privileged wireless performance, while third-party apps like Camo experience connections with latency (unpredictable latency) and cannot achieve comparable latency or throughput. Because Apple controls both the radio stack and the entitlements required for stable infrastructure and peer-to-peer Wi-Fi modes, Camo is effectively prevented from accessing the same transport capabilities that Apple relies on. In short, Apple reserved the only viable wireless path for its own product while degrading or blocking that path for everyone else.

117.    Accordingly, not only does Continuity Camera benefit from being Apple's own built-in default feature, Apple also actively undermines competing apps like Camo. Apple's Continuity framework itself is what prevents Camo from offering low-latency wireless functionality. Beyond that, several aspects of Continuity Camera interfere with or obscure the Camo user experience. For example, when a user positioned their iPhone for use with Camo, Continuity Camera automatically launched on the device, and would **suspend the Camo app and block its connection** in a way that Reincubate cannot work around. This forces users to deviate from the default workflow to continue using Camo. Moreover, the first time a Mac using the macOS Ventura operating system, or later, lists available cameras, a pop-up appears promoting Continuity Camera—without referencing alternative options, like Camo. On information and belief, Apple's choices in the design and roll-out of Continuity Camera were designed to preserve its monopoly in the mobile OS market by undermining interoperability provided by Camo.

118. Furthermore, Camo faced several issues on the Apple-run App Store. Apple exercises strict control over how developers build and distribute apps for users of their devices. For example, developers may distribute native iPhone applications only through the Apple App Store, which remains the sole channel for downloading native iOS apps. This exclusive distribution model enables Apple to wield monopoly power over developers by enforcing contractual terms and rules that restrict the behavior of non-Apple apps and services. Through its App Store Review Guidelines, Apple dictates the standards apps must meet to appear on the App Store—and those standards can be changed at any time. These guidelines give Apple complete discretion to review and approve all apps and updates. Apple frequently uses this discretion to its advantage—altering or departing from its rules when it benefits the company—and allowing executives to oversee and influence the approval process for individual apps or updates. The company's enforcement of App Store policies is often inconsistent, and Apple has repeatedly used these rules to punish or limit developers whose technologies threaten to disrupt, compete with, or weaken Apple's monopoly position.

119. A small number of early phone as webcam products had existed before Camo but remained clunky, limited in capability, and lacked meaningful traction or the technical innovations embodied in the Asserted Patents and in the Camo product. Many of these other products and companies, however, relied on App Store practices that violated Apple's own developer rules and distorted user trust signals, including the use of coerced or falsified reviews (including where users admitted they were forced to leave positive reviews directly in their reviews), misuse of trademarks, deployment of multiple Bundle IDs, and publication of misleading App Store screenshots. Reincubate repeatedly reported these violations through Apple's official reporting mechanisms and directly to Apple's Evangelism and WWDR teams by phone, email, and formal submissions. Despite these reports, Apple took no meaningful corrective action.

120. One such firm—a company valued at approximately one billion dollars at the time—accumulated thousands of reviews reflecting coercive practices, with over 2,000 reviews expressly stating that users were required to submit five-star ratings to unlock core functionality. Despite receiving reporting on these violations from Reincubate, Apple continued to display only aggregate star ratings and selected excerpts, obscuring the scope of this misconduct.

121. This selective inaction stands in stark contrast to Apple's ordinary practice of strict

and pervasive enforcement of its App Store rules. On information and belief, Apple's selective enforcement allowed inferior substitutes that were not in compliance with Apple's rules to muddy the market, dilute Camo's signals of quality and goodwill, and weaken Camo's differentiation—thereby disadvantaging the independent, high-performance, cross-platform solution that posed a meaningful competitive threat to Apple's ecosystem control.

122.    Reincubate has also been unable to include an App Preview for Camo in Apple's App Store. Similar to Continuity Camera, Camo features a lightweight iOS interface, making it impossible to effectively demonstrate its functionality without showing the device mounted and connected to a Mac. In fact, Apple approved a video with just such an App Preview video[28] previously and it was live in the app store for some time before Apple forced Reincubate to take it down to get an update published in 2021. Although some members of Apple's App Review and Design teams have expressed sympathy, they have offered little guidance beyond repeated resubmissions and appeals. To the extent Apple has communicated requirements for an App Preview, they have been onerous and included things including that they could not include people or any real world use, no people holding the device, nor any items, nor any depictions of Reincubate hardware.  By contrast (and unsurprisingly), Apple's own marketing for Continuity Camera depicts every one of those things including people using the device, hardware, and the complete setup—something Camo is not permitted to do within the App Store.  Apple's control over both app distribution and app creation, including access to low-latency Wi-Fi, gives Apple tremendous power.  Apple's control guarantees that it continues to benefit from the contributions of third-party developers like Reincubate while also protecting itself from the competitive threats and pressure interoperable apps like Camo poses to Apple's mobile OS monopoly.

123.    Apple also controls access to the Mac App Store ("MAS") in a manner virtually identical to its control over the iOS App Store. For Camo, the MAS constituted an important distribution channel and competitive market. Reincubate repeatedly communicated to Apple the specific technical barriers that prevent Camo from qualifying for MAS distribution. Apple employees affiliated with the WWDR team represented in multiple emails that those barriers would be addressed and that Reincubate should not compromise its Camo product by getting it into MAS with just a subset of its features. Yet Apple has taken no action to remove them, leaving

---

[28] https://www.youtube.com/watch?v=mC5FTN7_qt0

Camo excluded from the MAS.

124.    Additionally, unlike most other Apple applications, Continuity Camera—despite having its own icon—is so deeply embedded within iOS that it cannot be deleted or treated as an independent app. Apple could still retain the advantages of a first-party offering even if Continuity Camera were removable, just as it does with apps like Home, Watch, and News. In contrast to those apps, however, disabling Continuity Camera requires users to dig several layers deep into the Settings menu.  On information and belief, this deep integration was not a matter of technical necessity but a deliberate design choice intended to foreclose third-party competition. By making Continuity Camera inseparable from the operating system, Apple ensured that users would default to its solution and that competing products like Camo would be deprived of visibility, user adoption, and interoperability within the iOS and macOS environments.

125.    Apple's developer video walks through, step by step, how to use Core Media IO ("CMIO") to build a "creative camera," replicating Camo's approach to filters and video streams and resulting in a similar—though more limited—product.  On information and belief, Apple produced and distributed this instructional content to steer developers toward derivative implementations that mimic Camo's functionality, thereby diluting Camo's competitive advantage and reinforcing Apple's dominance in the mobile operating system market. By promoting shallow reproductions of Camo's technology while simultaneously withholding the APIs and entitlements necessary for Camo to compete on equal footing, Apple used its control over developer resources to shape the competitive landscape in its favor.

126.    To be clear, Reincubate is not alleging that Apple's copying *alone*—commonly referred to as "Sherlocking"— always constitutes anticompetitive conduct or is always unlawful. Indeed, Apple has a long history of Sherlocking. But in most of those cases, Apple has not actively induced the developer to test and build software. Here, Apple actively cultivated a relationship of trust with Reincubate, induced the company to share technical details, beta builds, and market data, and leveraged that privileged access to inform its own development of Continuity Camera. Only after Reincubate had demonstrated that the solution worked, that demand existed, and that the model was viable did Apple absorb the concept. Apple did not simply absorb Camo's feature into iOS; it embedded it at the operating-system level, pre-installing it on every iPhone and Mac and integrating it so deeply that it displaced Camo's functionality, did not give access to APIs,

foreclosed interoperability, and strengthened Apple's platform lock-in. Thus, Reincubate spent multiple years and millions of dollars developing Camo and testing the market. Yes, Camo was new. Yes, Camo was expensive to develop. And yes, Camo was rigorously challenged. Apple cheered from the sidelines. And when Camo had completed its challenge, it became the newest feature of iOS.

127.    Indeed, Apple's willingness to engage in anticompetitive behavior traces its roots to the earliest days of the iPhone.  As early as 2010, then-CEO Steve Jobs discussed how to "further lock customers into our ecosystem" and "make Apple['s] ecosystem even more sticky."

128.    In response, Apple leveraged its control over app development and distribution to solidify its monopoly on mobile OS as the central access point for apps, products, and services. Although Apple frequently asserts that these restrictions are intended to safeguard user privacy and security, its internal records suggest otherwise. In practice, many of these limitations, including the limitations set forth above, serve to protect Apple's financial interests by suppressing direct or disruptive competition, like that of Camo, that could threaten its mobile OS monopoly.

129.    Thus, Apple is knowingly and deliberately degrading users' experiences with Camo in order to preserve its mobile OS market share and undermine interoperability.

## II.    Apple's Willful Infringement of United States Patents Nos. 11,924,258 and 12,335,323

### A.    The Reincubate Patents

130.    On March 5, 2024, the United States Patent and Trademark Office ("USPTO") duly and legally issued United States Patent No. 11,924,258 (the "'258"), entitled "Devices, Systems and Methods for Video Processing."  Reincubate owns all rights, title, and interest in the '258 Patent. A true and correct copy of the '258 Patent is attached hereto as **Exhibit 1**.

131.    On June 17, 2025, the USPTO duly and legally issued United States Patent No. 12,335,323 (the "'323"), also entitled "Devices, Systems and Methods for Video Processing." Reincubate owns all rights, title, and interest in the '323 Patent. A true and correct copy of the '323 Patent is attached hereto as **Exhibit 2**. Collectively, the '258 and '323 Patents may be referred to as the "Patents-in-Suit."

132.    The technology disclosed in the Patents-in-Suit relates to capturing, processing and enhancing video in a manner supportive of and suitable for the purposes of real-time video

communication.

133.    For illustration, Figure 1 of the '258 Patent is portrayed below:



Figure 1

134.    The technology disclosed in the Patents-in-Suit was not routine or conventional. The USPTO examined the patented technology and concluded that no prior art, alone or in combination, disclosed or rendered obvious any of the claims of the Patents-in-Suit.

135.    The Patents-in-Suit cover Camo.

136.    Apple itself has acknowledged the novelty of the technology disclosed in the Patents-in-Suit. Indeed, WWDR's Photo & Video Manager, Roland Wood wrote:

> Congrats on finally getting Camo into broader testing. I manage the Photo/Video segments for Worldwide Developer Relations at Apple as well as all camera manufacturers. I've been looking for a developer that was working on utilizing the iPhone cameras and APIs for webcam usage. **You might have done it as it seems**.

-43-

137. Apple itself has praised the technology disclosed in the Patents-in-Suit. For example, in or around October 2020, Apple employees listed Camo on the Apple App Store's "Apps we Love."

138. From Camo's launch through the end of 2021, Reincubate's twitter account received the following messages. On information and belief, the senders were employed by Apple on the dates they sent the messages:

| Date | Sender | Message |
|---|---|---|
| Aug. 20, 2020 | @[redacted] | "I love Camo but was wondering when we might see Webex Meetings working?!" |
| June 23, 2021 | @[redacted] | "Hey! AMAZING app, good job." |
| Aug. 27, 2021 | @[redacted] | "hey folks, just started using Camo and am bowled over[.]" |

139. On April 27, 2021, iPhone Engineer Vitor Silva emailed Mr. Fitzpatrick, "I have been using [Camo] with Webex and love it! Making it known internally too as I look better than everyone, ha."

140. On April 30, 2021, WWDR team member, Mr. Basurto Rosenzweig, emailed Mr. Fitzpatrick: "I've started using [Camo] daily since my M1 Mac mini arrived last year."

141. In May 2021, a member, at the time, of Apple's Human Interface Team direct messaged Reincubate's CEO on Twitter :

| Date | Sender | Message |
|---|---|---|
| May 18, 2021 | @[redacted] | "hey man…just wanted to share i use camo every day for work and love it" |

Notably, another member of that same team, the Human Interface Design Team, together with Apple's Craig Federighi, announced Continuity Camera to the world at WWDC in 2022.[29]

142. In July 2021, Apple employees who work on Apple University—Apple's internal training and professional-development program for educating and developing Apple employees—

---

[29] https://youtu.be/q5D55G7Ejs8?t=5251

purchased multiple Camo licenses.

143.    On August 2, 2021, Camo was featured as the "App of the Day" on Apple's App store:



**Not a fan** of camera-on video calls? *Camo* could change that. It turns your iPhone or iPad into a pro-level HD webcam for Mac and Windows. The advanced editing tools will ensure you – and your background – look tip-top onscreen.

**What we love:** The app leverages your device's existing camera so you don't need to buy an expensive external webcam, and no additional software drivers are required. Plus it's compatible with most video-call platforms and apps, including *Zoom*, *Microsoft Teams*, *Meet* and *Slack*.

144.    On September 23, 2021, Mr. Fitzpatrick attended a video call with a Senior Systems Engineer and Government Education Manager at Apple, who informed Mr. Fitzpatrick that Camo was very popular within Apple in an "unofficial" capacity.

145.    As further alleged herein, Apple infringes certain claims of the Patents-in-Suit.

146.    The Patents-in-Suit claim priority to and the benefit of United Kingdom Patent Application Nos. GB 2110144.9, filed on July 14, 2021, and United Kingdom Patent Application No. GB 2020571.2 filed on December 23, 2020.

147.    On information and belief, Apple was aware of United Kingdom Patent Application Nos. GB 2110144.9 and GB 2020571.2 at least as early as June 6, 2022.

148.    Yet, on June 6, 2022, Craig Federighi, unveiled Continuity Camera to WWDC22 attendees and remarkably exclaimed, "**[n]ow with Continuity Camera, you can use iPhone as your webcam**" and **"powered by the advanced capabilities of the iPhone camera system, letting you do things that were never before possible with a webcam**."

149.    Mr. Federighi omitted the fact that Camo users—including Apple employees—had been using iPhones as their Webcam since Camo's launch *two years earlier*.

-45-

150.    Apple's own employees have recognized that Continuity Camera infringes the Patents-in-Suit:

151.    Immediately after Mr. Federighi's presentation, Ms. Lin emailed Mr. Fitzpatrick:

> **I realise that one of the features that we announced today is very similar to what Camo offers, and I wanted to check in with you to see how you are feeling about that?** I believe there is still space for Camo to compete with the platform feature and succeed on the App Store. **I have told Shaan Pruden (our WWDR Director) about this, and she would be happy to meet you for a coffee**. Would you like me to organise that? When will you be flying home?

152.    That same day, John Geleynse, Apple's former Director of Developer Evangelism messaged Mr. Fitzpatrick and asked to meet. Mr. Geleynse prodded Mr. Fitzpatrick to "ignore" the claims of "Sherlocking" on social media and "just keep building."

153.    Tech publications similarly recognize that Continuity Camera infringes the Patents-in-Suit. On June 6, 2022, iMore published:

> Apple today announced a raft of new software updates including macOS Ventura, the Mac's next big software update that will arrive later this year. It'll include a new feature called **Continuity Camera** when it does, a feature that allows iPhones to be used as Mac webcams — **something that might sound familiar. That's because being able to use an iPhone as a webcam is nothing new, apps including the popular and excellent Camo already make that a reality**.

154.    On June 13, 2022, TechCrunch published:

> Apple's new continuity feature will let you use your iPhone as a webcam, **which was Camo's main pitch**. The iPhone-maker is partnering with Belkin to release a special mount later this year, which will hold your iPhone atop your MacBook screen. Plus, it will release an API for Camera Continuity so other apps could easily take advantage of this feature.

155.    On June 6, 2022, after Mr. Federighi's keynote, Ms. Lin informed the WWDR Director, Shaan Pruden (who was also a Camo user at the time), that Continuity Camera copied Reincubate's technology. Ms. Lin encouraged Ms. Pruden to discuss the issue with Mr. Fitzpatrick.

156.    The next day, Ms. Pruden and Mr. Fitzpatrick met in Tantau 14 at Apple Park. Ms. Pruden complimented Mr. Fitzpatrick for remaining so "professional" considering Apple's unveiling of Continuity Camera.

157.    Nine days later, Ms. Pruden and Mr. Fitzpatrick met again via Webex. Ms. Pruden

then informed Mr. Fitzpatrick that it was WWDR's job to help developers "whether they compete with us or not", thus admitting that Continuity Camera practices the technology claimed in the Patents-in-Suit.

158.    During that meeting, Mr. Fitzpatrick inquired as to whether Apple would license Reincubate's intellectual property. Ms. Pruden informed him that she would initiate internal discussions regarding that issue. She then thanked Mr. Fitzpatrick for "not spitting the dummy" and promised they would have another meeting in two weeks.

159.    On June 23, 2022, the application that later issued as the '258 Patent was published.

160.    On June 24, 2022, Ms. Lin emailed Mr. Fitzpatrick, "I just heard from Shaan that she is not ready to re-connect with you just yet, as she is still investigating a few avenues and doesn't have anything definitive to say for now."

161.    On July 22, 2022, Mr. Fitzpatrick emailed Ms. Lin, "I hope all's well. This is very much still on my radar. Has Shaan come back with some times to talk?"

162.    Based on Reincubate's experience, and as others have previously alleged, certain Apple employees, including Ms. Pruden, avoided reducing their representations and discussions to writing whenever possible.[30]

163.    On August 3, 2022, Mr. Fitzpatrick followed up with Ms. Lin, "[h]ave you heard from Shaan on timing the next call? I hope all is OK with her. She was keen when we spoke last that she would follow up on her return, and that there were various things in motion on her side. That was reiterated when the meeting got bumped. When should we look to reconnect?" Ms. Lin responded, "**I have chased Shaan a few times, and just bumped it again. For some reason she's been quiet**."

164.    On August 5, 2022, Ms. Lin emailed Mr. Fitzpatrick, "I heard back from Shaan. She's still pursuing those conversations, however due to summer holidays, this is proving difficult at the moment."

165.    On September 5, 2022, Mr. Fitzpatrick followed up with Ms. Lin, "I hope all's well.

---

[30] See Chance Miller, *Tim Sweeney Says Epic Games Lost Its App Store Lawsuit Because 'Apple Didn't Write Anything Down'*, 9to5Mac (Dec. 12, 2023), https://9to5mac.com/2023/12/12/tim-sweeney-apple-google-lawsuit/.

I'm looking forward to continuing the conversation with Shaan. When we spoke with her last, she said we should reconnect straight after her break. **I'm conscious of time passing and the conversation is critical for us** — might she be good to resume shortly?"

166.    On October 17, 2022, Mr. Fitzpatrick followed up with Ms. Lin, "I'm now back from paternity leave and raring to resume the conversation with Shaan. How are things looking for a chat this week?" Ms. Lin responded, "I have caught up with Shaan, she is still pursuing a number of different fronts for you, and at the moment doesn't have much update to share."

167.    Following WWDC 2022, Ms. Pruden, repeatedly assured Reincubate that she would "close the loop" on Apple's internal review of the company's concerns. As of the end of 2022, Ms. Pruden had failed to meet with anyone from Reincubate's team. Although WWDR initially convened meetings on June 7 and June 16, the subsequent June 24 meeting was cancelled, and over the following months Pruden offered repeated assurances that discussions were "still live" while providing no updates, timelines, or substantive responses. By October, Apple had neither scheduled further meetings nor delivered any resolution and began pretending as though Apple employees had never reached out to begin potential acquisition discussions to begin with, leaving Reincubate without the follow-through that Pruden had repeatedly promised. And that loop was never fully closed other than a message in June of 2023 explaining that internal M&A discussions "did not lead anywhere."

168.    Apple began patenting its own products related to Continuity Camera. For example, on September 9, 2022, Apple filed U.S. Patent Application 17,934,477 (the '477 Application), entitled, "Accessory Support Devices for Electronic Devices."

169.    The '477 Application claims a "multi-part clip for supporting a portable electronic device at an electronic computing device."

170.    Tech publications have recognized that the '477 Application supports Continuity Camera. For example, Patently Apple titled an article related to the '477 Application, "The Detailed Patent behind the iPhone Mount supporting Apple's Continuity Camera Features for MacBooks was Published today."

171.    The '477 Application acknowledges the novel innovation claimed in the Patents-in-Suit:

- By interconnecting a portable electronic device with other separate electronic computing devices in this manner, various capacities and capabilities specific to each of the electronic devices may be **advantageously leveraged such that, together, the multiple electronic devices form a single collective system that is highly-optimized**. Para. [0004].

- [U]tilizing the camera and/or video features of the portable electronic device in tandem with, for example, a display feature of the electronic computing device **may provide an optimal operating and visualizing environment for the performance of routine and ordinary tasks, such as video conferencing or videotelephony operations, as well as for the creation of more complex forms of multimedia content**. Para [0005].

172.    Mr. Fitzpatrick attended Apple's Worldwide Developer Conference 2023 ("WWDC23") in or around June 2023. This time, Mr. Fitzpatrick sought out Mr. Federighi himself.

173.    During WWDC23, Mr. Fitzpatrick informed Mr. Federighi that Reincubate owned the intellectual property covering Continuity Camera, including the '258 Patent. Mr. Fitzpatrick then asked for a photograph.



174.    Thus, at least as early as WWDC23, Apple's Senior Vice President of Software Engineering had actual notice of the '258 Patent. Additionally, at least as early as WWDC23, Apple became aware that anyone who uses the mount claimed in the '477 Application is likely using it *with* Continuity Camera and therefore infringing the '258 Patent.

175.    Apple displays CEO Tim Cook's mantra front and center on its website: "We do

the right thing, even when it's not easy."

## COUNT I

### Violation of the Sherman Act Section 2 – Monopolization

### 15 U.S.C. § 2

176.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

177.    Apple has willfully acquired and maintained monopoly power in the relevant market for Mobile Operating Systems.

178.    Apple possesses monopoly power in the relevant market for Mobile Operating Systems.

179.    Apple has nearly 60% market share in the relevant market for Mobile Operating Systems, including smartphones and tablets,[31] and the barriers to entry into the relevant market are substantial.

180.    Apple's dominance in mobile operating systems is reinforced by powerful lock-in effects and high switching costs. Consumers who purchase an iPhone are drawn into a tightly integrated ecosystem of hardware, software, and services that are designed to work best—often only—with one another. Features such as Continuity Camera, AirDrop, iMessage, and iCloud create an expectation of seamless operation within Apple's ecosystem, while introducing friction and degradation when users attempt to connect to competing devices or services. As users accumulate data, apps, and accessories tied to Apple's platforms, the cost of switching to a competing device grows prohibitive. This deliberate design of technical dependency ensures that users remain within Apple's ecosystem even when superior or lower-priced alternatives exist, allowing Apple to maintain monopoly power in mobile operating systems and adjacent markets.

181.    In addition, Apple has willfully acquired and maintained monopoly power in the relevant market by means of anticompetitive conduct as alleged herein, through an exclusionary

---

[31] StatCounter GlobalStats, *Tablet Vendor Market Share United States of America*, https://gs.statcounter.com/vendor-market-share/tablet/united-states-of-america (last visited Oct. 23, 2025); StatCounter GlobalStats, *Mobile Vendor Market Share United States of America*, https://gs.statcounter.com/vendor-market-share/mobile/united-states-of-america (last visited Oct. 23, 2025).

course of conduct and the anticompetitive acts described herein. Each of Apple's actions individually and collectively increased, maintained, or protected its Mobile Operating System monopoly.

182.    Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app distribution and access to low-latency Wi-Fi that have impeded Camo from competing and allowing interoperability between iPhones and PCs, and Androids and Macs, among others. The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts.

183.    Apple has deliberately constructed what courts have recognized as a "walled garden" ecosystem—one in which Apple alone determines the terms of participation, controls access to essential interfaces, and uses that control to maintain monopoly power.[32] Apple has since extended that walled garden beyond the iPhone to the Mac, iPad, Watch, and Vision Pro ecosystems, using its control over operating-system frameworks and developer entitlements to exclude or severely undercut cross-platform products like Reincubate's Camo. This structure allows Apple to favor its own first-party software, block interoperability with competing platforms, and reinforce the very barriers to entry that sustain its dominance in mobile operating systems.

184.    Apple's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by Apple's anticompetitive and unlawful conduct.

185.    Apple's conduct has affected a not insubstantial amount of interstate commerce in Mobile Operating Systems.

186.    Apple's conduct has had an anticompetitive effect in the relevant market for Mobile Operating Systems.

187.    Consumers and software developers suffer from Apple's pattern of wrapping third-party software directly into iOS because such conduct discourages third-party software developers from investing in future innovative products.

188.    Reincubate seeks injunctive relief, treble damages, attorneys' fees, pursuant to the

---

[32] *Epic Games, Inc. v. Apple Inc*., No. 21-16506, slip op. at 12 (9th Cir. Apr. 24, 2023).

Clayton Act § 4, and such other relief as the Court deems just and proper.

189.    In addition, Apple's Developer Program License Agreement ("DPLA") includes a provision authorizing Apple to terminate any developer's access to the program in the event that the developer "commences an action for patent infringement against Apple."

> **11.2    Termination**
> This Agreement and all rights and licenses granted by Apple hereunder and any services provided hereunder will terminate, effective immediately upon notice from Apple:
> (a) if You or any of Your Authorized Developers fail to comply with any term of this Agreement other than those set forth below in this **Section 11.2** and fail to cure such breach within 30 days after becoming aware of or receiving notice of such breach;
> (b) if You or any of Your Authorized Developers fail to comply with the terms of **Section 9 (Confidentiality)**;
> (c) in the event of the circumstances described in the subsection entitled "Severability" below;
> (d) if You, at any time during the Term, commence an action for patent infringement against Apple;

190.    Through this clause, Apple conditions participation in its essential developer platform on an agreement not to exercise federally protected rights to enforce valid patents against Apple.

191.    The clause serves no legitimate business purpose. Its only practical effects are to deter developers from asserting intellectual-property rights and to punish those who do.

192.    By conditioning continued access to the Apple Developer Program on an agreement not to sue Apple for patent infringement, the clause operates as a blanket covenant not to sue imposed by a monopolist on dependent developers.

193.    By imposing this retaliatory termination provision, Apple has willfully maintained its monopoly power in violation of Section 2 of the Sherman Act. The provision coerces developers to relinquish rights protected under the Patent Act and chills the assertion of patents that would otherwise promote innovation and competition.

194.    On May 4, 2023, Apple employee SiQing Lin presented Reincubate with an unspecified "opportunity." Apple refused to disclose any details regarding that opportunity unless Reincubate first executed two agreements: (i) a nondisclosure agreement, and (ii) a second agreement that, in part, granted Apple a license to certain Reincubate intellectual property, and— separately and far more strikingly—required Reincubate to release Apple from all claims relating to that intellectual property and to indemnify Apple against any related suits. The same agreement

also authorized Apple to create advertising copy and derivative work product based on Reincubate's technology without Reincubate's review or approval. Although limited IP licenses are sometimes negotiated in defined commercial relationships, Apple demanded these sweeping releases, indemnities, and unilateral marketing rights before even disclosing what the purported opportunity was. Reincubate declined. It was later revealed that the "opportunity" consisted solely of a nomination for an Apple Design Award. The fact that this solely related to a potential nomination renders Apple's insistence on broad IP rights with **a full release and indemnity**, entirely disproportionate and coercive.

195.    The 2020 House Report echoed this concern: "An attorney representing app developers said they 'fear retaliation by Apple' and are 'worried that their private communications are being monitored, so they won't speak out against abusive and discriminatory behavior.'

196.    Apple's conduct has caused and will continue to cause injury to competition by deterring patent enforcement, suppressing innovation, and reinforcing Apple's unlawful monopoly in mobile operating systems.

197.    Apple's conduct has caused, and continues to cause, harm to consumers. By foreclosing cross-platform interoperability and embedding its own inferior version of Camo's technology into iOS, Apple has reduced consumer choice, degraded product quality, and suppressed innovation in camera and connectivity software. Users who wish to connect Android phones to Mac computers—or iPhones to non-Apple systems—are deprived of effective options and forced to rely on Apple's closed solutions. Prices remain high, functionality limited, and innovation stifled, not because of technical impossibility but because Apple's restrictions eliminate the competitive pressure that would otherwise drive improvement.

198.    Consumers who purchase iPhones and Mac computers are unaware of the extent to which Apple restricts interoperability between its products and competing devices or services. Apple markets its ecosystem as open and intuitive, emphasizing seamless integration and high performance, but it does not disclose that such integration is deliberately limited to Apple-branded devices.

199.    A typical consumer cannot reasonably anticipate that core features—such as using an Android phone as a webcam for a Mac or connecting an iPhone to a Windows computer with the same ease—are technically possible but intentionally disabled by Apple. These aftermarket

restrictions only become apparent after purchase, when users attempt to connect non-Apple devices and encounter unexplained failures or degraded performance.

200.    Moreover, this lack of consumer awareness is especially pronounced because Apple's interoperability restrictions are a recent, post-hoc development. Before Apple introduced its competing Continuity Camera feature, Camo operated within Apple's ecosystem with Apple's full support and encouragement. It allowed iPhones and Android devices alike to function as webcams for Mac computers. Consumers who purchased iPhones or Macs expecting continued compatibility with Camo had no notice that Apple would later disable or impair that functionality. These restrictions are not the product of any technical necessity; they exist solely at Apple's discretion and can be—and routinely are—altered or withdrawn based on Apple's business priorities at that time.

201.    As the direct and proximate result of Apple's conduct, Reincubate has suffered—and will continue to suffer—economic harm, lost revenue, lost market share, increased research and development costs, lost investment value, reputational harm, irreparable injury, and damages in an amount to be proven at trial.

202.    Reincubate seeks declaratory and injunctive relief barring enforcement of the termination-upon-suit clause, as well as treble damages, attorneys' fees pursuant to the Clayton Act § 4, and such further relief as the Court deems just and proper.

## COUNT II

### Declaratory Judgment—Unenforceability of DPLA Termination Clause

203.    Reincubate incorporates the foregoing paragraphs by reference as though fully set forth herein.

204.    An actual and justiciable controversy exists between Reincubate and Apple regarding the enforceability and lawfulness of Section 11.2(d) of the Apple Developer Program License Agreement, which authorizes Apple to terminate a developer's participation in the Apple Developer Program if the developer "commence[s] an action for patent infringement against Apple."

205.    Reincubate has commenced this action for patent infringement against Apple.

206.    Reincubate seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 that Section

-54-

11.2(d) of the DPLA is unenforceable and unlawful as applied to Reincubate's patent infringement claims in this action. This section of the DPLA constitutes an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The provision is an agreement between Apple and its developers that restrains competition by suppressing patent enforcement. By conditioning access to the iOS platform on an agreement not to sue Apple for patent infringement, Apple has imposed a restraint that has no purpose other than to stifle competition and insulate Apple from the consequences of its infringement. The restraint is naked, has no procompetitive justification, and is unreasonable under either a per se or rule of reason analysis.

207.    Section 11.2(d) of the DPLA is further unenforceable because it constitutes an unlawful exercise of monopoly power in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Apple possesses monopoly power in the mobile operating system market, as alleged herein. Apple has used that monopoly power to impose a contractual term that no developer could resist and that serves only to protect Apple's ability to appropriate developer technology without consequence. The clause is an exclusionary practice that maintains Apple's monopoly by eliminating a competitive check—patent enforcement—that would otherwise constrain Apple's conduct.

208.    Section 11.2(d) of the DPLA is further unenforceable because it is contrary to public policy. The Patent Act grants inventors the exclusive right to their inventions and provides a cause of action for infringement. 35 U.S.C. §§ 154, 271. These rights exist to promote innovation by ensuring that inventors can reap the rewards of their contributions. A contractual provision that forces inventors to relinquish their right to enforce valid patents—on pain of losing access to an essential platform—is contrary to the purposes of the Patent Act and unenforceable as against public policy.

209.    Reincubate has no adequate remedy at law. Reincubate faces imminent and irreparable harm from Apple's threat to terminate its membership in the Apple Developer Program. Without declaratory relief, Reincubate must choose between vindicating its patent rights and preserving its business. Reincubate seeks preliminary and permanent injunctive relief.

## COUNT III

### Infringement of United States Patent No. 11,924,258

#### A.    Continuity Camera

210.    The '258 Patent discloses a **control device (5)** and a **capture device (10)** connectable via a **local connection (6)**:



Figure 1

211.    For illustration, independent claim 1 of the '258 Patent, which is representative of independent claims 19 and 20, claims:

> A video processing system suitable for video conferencing, the system comprising:
>
> a control device;
>
> a capture device connectable via a local connection to the control device, the capture device having a sensor set including a camera for generating video and a capture device pairing module for communicatively pairing the capture device with the control device, the control device comprising a control device pairing module for communicatively pairing the control device with the capture device, a display unit for

displaying video streams, and an audio-interface for generating video stream audio signals;

at least one cooperation application, the at least one cooperation application being executed on, and configuring, at least one of the capture device and the control device to be operable by the local user to communicatively pair the capture device and the control device for cooperation with one another, via the respective capture device and control device pairing modules, and to perform a control operation and a video processing operation, wherein the video processing operation split between the capture device and the control device;

wherein the control operation comprises:

displaying on the display unit of the control device a user interface having at least one UI element;

receiving a user input, from the local user, on the at least one UI element; and,

in response to receiving the user input on the at least one UI element, changing settings of the camera of the capture device;

wherein the video processing operation comprises:

performing, at the capture device, a first set of video processing tasks on video generated by the camera of the capture device;

transferring over the local connection, by their respective pairing modules, that capture-device-processed video from the capture device to the control device;

performing, at the control device, a second set of video processing tasks on the capture-device-processed video; and,

storing the control-device-processed video on the control device.

212.    Continuity Camera infringes independent claims 1, 19, and 20 of the '258 Patent. By way of non-limiting example, Continuity Camera includes a control device with a display unit and a capture device with a camera for generating video:



213.    Any Mac compatible with macOS Ventura is a control device under the '258 Patent.

214.    Any iPhone introduced in 2018 or later is a capture device under the '258 Patent.

215.    Apple Studio Display likewise constitutes a control device under the '258 Patent, as it includes an integrated display unit and runs an embedded operating system (a version of iOS) that manages camera input, video processing, and communication with a separate capture device.

216.    The iPhone and MacBook are connectable via a local connection and users may pair the iPhone and MacBook with one another via their pairing modules:



217.    Video processing operation is split between the iPhone and MacBook. For example,

the iPhone performs certain video processing tasks and the MacBook performs certain video processing tasks.

218.    The display unit of a Mac device displays a user interface having at least one UI element, and a user may select at least one UI element:



219.    In response to receiving the user input on the at least one UI element, the settings of the iPhone camera are changed. By way of non-limiting example, the user can select "Center Stage" which causes the capture device to switch to an ultra-wide camera lens and follow the user:



**Camera Follows User from Left to Right à**




220.    The iPhone performs a first set of video processing tasks. By way of non-limiting example, the iPhone can apply filters such as "Studio Light" to the video stream.

221.    The iPhone processed video is transferred to a MacBook device, and the MacBook performs a second set of video processing tasks, such as, adding overlays to the video stream.

222.    The MacBook processed video is stored on the MacBook.

223.    The MacBook displays a user interface (UI) having at least one UI element that is configured to receive a user input. In response to receiving the input, the settings of the iPhone camera may be changed. Thus, Continuity Camera additionally infringes claim 3.

224.    The iPhone and MacBook are independent, standalone devices, and the iPhone screen is physically smaller than the display unit of the MacBook. Thus, Continuity Camera additionally infringes claim 4.

225.    The MacBook includes a networking module configured to establish a connection with at least one recipient. Further, a video stream may be generated at the MacBook and transmitted to the recipient. The recipient's video stream may be received by the MacBook, such as when Continuity Camera is used for Facetime. Thus, Continuity Camera additionally infringes claim 6.

226.    The iPhone includes a depth sensor for generating depth information. Thus, on information and belief, Continuity Camera infringes claim 8 by performing a bokeh effect on the video generated by the iPhone in dependence on said depth information.

227.    Filters, effects, overlays, image overlays, logo overlays, text overlays, and subtitles may be applied to at least a region of the Continuity Camera video stream. Further, Continuity Camera may detect user behavior or specific sounds, and in response modify other video processing tasks. Thus, Continuity Camera additionally infringes claim 11.

228.    The MacBook includes a memory and the Continuity Camera stream may be stored in the memory. Thus, Continuity Camera additionally infringes claim 16.

229.    As alleged throughout this Complaint, Apple's infringement has been willful, intentional, and deliberate. Apple knows, or should have known, that making, using, offering to sell, and selling, the Continuity Camera would infringe the '258 Patent. Nevertheless, Apple infringed and continues to infringe the '258 Patent.

230.    Apple also knowingly and intentionally induces infringement of claims of the '258 Patent in violation of 35 U.S.C. § 271(b). Apple's Senior Vice President of Software Engineering has had knowledge of the '258 Patent and the infringing nature of Continuity Camera at least as early as WWDC23. Despite this knowledge of the '258 Patent, Apple continues to actively encourage and instruct its customers and end users to use Continuity Camera in ways that directly infringe the '258 Patent. Apple also continues to make, use, offer for sale, sell, Continuity Camera, despite its knowledge of the '258 Patent, thereby specifically intending for and inducing its customers to infringe the '258 Patent through the customers' normal and customary use of Continuity Camera.

231.    As the direct and proximate result of Apple's conduct, Reincubate has suffered—and will continue to suffer—economic harm,  irreparable injury, and damages in an amount to be proven at trial. Reincubate seeks permanent injunctive relief in addition to damages.

232.    Reincubate is also entitled to enhanced damages and reasonable attorneys' fees adequate to compensate it for Apple's willful infringement and other conduct.

**B.    Final Cut camera with Live Multicam in Final Cut Pro for iPad**

233.    Final Cut Camera with Live Multicam in Final Cut Pro for iPad ("Final Cut") infringes independent claims 1, 19, and 20 of the '258 Patent. By way of non-limiting example, Final Cut includes a control device with a display unit and a capture device with a camera for generating video:



234.    Any iPad that supports Final Cut Pro is a control device under the '258 Patent.

235.    Any iPhone that supports the Final Cut Camera app is a capture device under the '258 Patent.

236.    The iPhone and iPad are connectable via a local connection and users may pair the iPhone and iPad with one another via their pairing modules.

237.    The display unit of an iPad device displays a user interface having at least one UI element, and a user may select at least one UI element, and in response to receiving user input on the at least one UI element, the settings of the iPhone camera are changed:



238.    The iPhones perform a first set of video processing tasks. By way of non-limiting example, user can adjust resolution, orientation, frame rate, Apple ProRes, and Color & Dynamic Range.

239.    The iPhone processed video is transferred to an iPad device, and the iPad performs a second set of video processing tasks, such as, by way of non-limiting example, transcribing captions and adding special effects.

240.    The iPad processed video is stored on the iPad.

241.    The iPad displays a user interface (UI) having at least one UI element that is configured to receive a user input. In response, the settings of the iPhone camera may be changed. Thus, Final Cut additionally infringes claim 3.

242.    The iPhone and iPad are independent, standalone devices, and the iPhone screen is physically smaller than the display unit of the iPad. Thus, Final Cut additionally infringes claim 4.

243.    The iPhone includes a depth sensor for generating depth information. Thus, on information and belief, Final Cut infringes claim 8 by performing a bokeh effect on the video generated by the iPhone in dependence on said depth information.

244.    Filters, effects, overlays, image overlays, logo overlays, text overlays, and subtitles may be applied to at least a region of the Final Cut video stream. Further, Final Cut may detect user behavior or specific sounds, and in response modify other video processing tasks. Thus, Final Cut additionally infringes claim 11.

245.    The iPad includes a memory and the Final Cut stream may be stored in the memory. Thus, Final Cut additionally infringes claim 16.

246.    As alleged throughout this Complaint, Apple's infringement has been willful, intentional, and deliberate. Apple knows, or should have known, that making, using, offering to sell, and selling, Final Cut would infringe the '258 Patent. Nevertheless, Apple infringed and continues to infringe the '258 Patent.

247.    Apple also knowingly and intentionally induces infringement of claims of the '258 Patent in violation of 35 U.S.C. § 271(b). Apple's Senior Vice President of Software Engineering has had knowledge of the '258 Patent and the infringing nature of Final Cut since at least as early as WWDC23. Despite this knowledge of the '258 Patent, Apple continues to actively encourage and instruct its customers and end users to use Final Cut in ways that directly infringe the '258 Patent. Apple also continues to make, use, offer for sale, sell Final Cut, despite its knowledge of the '258 Patent, thereby specifically intending for and inducing its customers to infringe the '258 Patent through the customers' normal and customary use of Final Cut.

248.    As the direct and proximate result of Apple's conduct, Reincubate has suffered—and will continue to suffer—economic harm, irreparable injury, and damages in an amount to be proven at trial. Reincubate seeks permanent injunctive relief in addition to damages.

249.    Reincubate is also entitled to enhanced damages and reasonable attorneys' fees adequate to compensate it for Apple's willful infringement and other conduct.

## COUNT IV

### Infringement of United States Patent No. 12,335,323

#### A.    Continuity Camera

250.    The '323 Patent discloses a **control device (5)** and a **capture device (10)** connectable via a **local connection (6)**:



Figure 1

251.    For illustration, independent claim 1 of the '323 Patent, which is representative of independent claims 20 and 21, claims:

A video processing system suitable for at least one of: video communications and video recording, the system comprising:

a control device;

a capture device connectable via a local connection to the control device, the capture device having a sensor set including a camera for generating video and a capture device pairing module for communicatively pairing the capture device with the control device, the control device comprising a control device pairing module for communicatively pairing the control device with the capture device, and a display unit for displaying video streams;

at least one cooperation application, the at least one cooperation application being executed on, and configuring, at least one of the capture device and the control device to be operable by the local user to communicatively pair the capture device and the control device for cooperation with one another, via the respective capture device and control device pairing modules, and to perform a control operation and a video processing operation;

wherein the control operation comprises determining the respective technical capabilities of the capture device and the control device and, in dependence on the determined technical capabilities:

> displaying on the display unit of the control device a user interface having at least one UI element;

> receiving a user input, from the local user, on the at least one UI element; and,

> in response to receiving the user input on the at least one UI element, and in dependence on the respective technical capabilities of the capture device and the control device, execute at least one of:

> changing settings of the camera of the capture device;

> specifying video processing tasks to be performed by the capture device;

> specifying video processing tasks to be performed by the control device;

> displaying video, on the display unit, of video generated by the capture device;

> starting video generation by the camera of the capture device; and

> stopping video generation by the camera of the capture device.

252. Continuity Camera infringes independent claims 1, 20, and 21 of the '323 Patent. By way of non-limiting example, Continuity Camera includes a control device with a display unit and a capture device with a camera for generating video:



253.    Any Mac compatible with macOS Ventura is a control device under the '323 Patent.

254.    Any iPhone introduced in 2018 or later is a capture device under the '323 Patent.

255.    The iPhone and MacBook may be communicatively paired with one another:



256.    On information and belief, an operation determines the respective technical capabilities of the iPhone and MacBook.

257.    The display unit of a MacBook device displays a user interface having at least one UI element, and a user may select at least one UI element:



258.    In response to receiving the user input on the at least one UI element, and based on the technical capabilities of the iPhone and MacBook, the settings of the iPhone camera are changed.

259.    In response to receiving the user input on the at least one UI element, and based on the technical capabilities of the iPhone and MacBook, video processing tasks may be performed by the iPhone. By way of non-limiting example, the iPhone can apply filters such as "Studio Light" to the video stream.

260.    In response to receiving the user input on the at least one UI element, and based on the technical capabilities of the iPhone and MacBook, video processing tasks may be performed by the MacBook. By way of non-limiting example, the MacBook may add overlays to the video stream.

261.    In response to receiving the user input on the at least one UI element, and based on the technical capabilities of the iPhone and MacBook, the MacBook may display the video generated by the iPhone.

262.    In response to receiving the user input on the at least one UI element, the iPhone's camera may start generating video.

263.    In response to receiving the user input on the at least one UI element, the iPhone's camera may stop generating video.

264.    A first set of video processing tasks on the video generated by the camera of the capture device is performed on the capture device. By way of non-limiting example, the capture device can apply filters such as "Studio Light" to the video stream. Further, the capture-device-processed video is transferred from the capture device to the control device.  Thus, Continuity Camera additionally infringes claim 2.

265.    The MacBook displays a user interface (UI) having at least one UI element that is configured to receive a user input. In response, the settings of the iPhone camera may be changed. Thus, Continuity Camera additionally infringes claim 4.

266.    The iPhone and MacBook are independent, standalone devices, and the iPhone's screen is physically smaller than the display unit of the Mac. Thus, Continuity Camera additionally infringes claim 5.

267.    The MacBook includes a networking module configured to establish a connection with at least one recipient. Further, a video stream may be generated at the MacBook and transmitted to the recipient. The recipient's video stream may be received by the MacBook, such as when Continuity Camera is used for Facetime. Thus, Continuity Camera additionally infringes claim 7.

268.    The iPhone includes a depth sensor for generating depth information. Thus, on information and belief, Continuity Camera infringes claim 9 by performing a bokeh effect on the video generated by the iPhone in dependence on said depth information.

269.    Filters, effects, overlays, image overlays, logo overlays, text overlays, and subtitles may be applied to at least a region of the Continuity Camera video stream. Further, Continuity Camera may detect user behavior or specific sounds, and in response modify other video processing tasks. Thus, Continuity Camera additionally infringes claim 12.

270.    The MacBook includes a memory and the Continuity Camera stream may be stored in the memory. Thus, Continuity Camera additionally infringes claim 17.

271.    As alleged throughout this Complaint, Apple's infringement has been willful, intentional, and deliberate. Apple knows, or should have known, that making, using, offering to sell, and selling, the Continuity Camera would infringe the '323 Patent. Nevertheless, Apple infringed and continues to infringe the '323 Patent.

272.    Apple also knowingly and intentionally induces infringement of claims of the '323 Patent in violation of 35 U.S.C. § 271(b). On information and belief, Apple has had knowledge of the '323 Patent and the infringing nature of Continuity Camera at least as early as May 23, 2024, when the Patent published. Despite this knowledge of the '323 Patent, Apple continues to actively encourage and instruct its customers and end users to use Continuity Camera in ways that directly infringe the '323 Patent. Apple also continues to make, use, offer for sale, sell, Continuity Camera, despite its knowledge of the '323 Patent, thereby specifically intending for and inducing its customers to infringe the '323 Patent through the customers' normal and customary use of Continuity Camera.

273.    As the direct and proximate result of Apple's conduct, Reincubate has suffered— and will continue to suffer—economic harm, irreparable injury, and damages in an amount to be proven at trial. Reincubate seeks permanent injunctive relief in addition to damages.

274.    Reincubate is also entitled to enhanced damages and reasonable attorneys' fees adequate to compensate it for Apple's willful infringement and other conduct.

**B.    Final Cut camera with Live Multicam in Final Cut Pro for iPad**

275.    Final Cut Camera with Live Multicam in Final Cut Pro for iPad ("Final Cut") Camera infringes independent claims 1, 20, and 21 of the '323 Patent. By way of non-limiting example, Final Cut includes a control device with a display unit and a capture device with a camera for generating video:



276.    Any iPad that supports Final Cut Pro is a control device under the '323 Patent.

277.    Any iPhone that supports the Final Cut Camera app is a capture device under the '323 Patent.

278.    The iPhone and iPad may be communicatively paired with one another.

279.    On information and belief, an operation determines the respective technical capabilities of the iPhone and iPad.

280.    The display unit of an iPad device displays a user interface having at least one UI element, and a user may select at least one UI element:



281.    In response to receiving the user input on the at least one UI element, and based on the technical capabilities of the iPhone and iPad, the settings of the iPhone camera are changed.

282.    In response to receiving the user input on the at least one UI element, and based on the technical capabilities of the iPhone and iPad, video processing tasks may be performed by the iPhone. By way of non-limiting example, a user can adjust resolution, orientation, frame rate, Apple ProRes, and Color & Dynamic Range.

283.    In response to receiving the user input on the at least one UI element, and based on the technical capabilities of the iPhone and iPad, video processing tasks may be performed by the iPad, such as by way of non-limiting example, transcribing captions and adding special effects.

284.    In response to receiving the user input on the at least one UI element, and based on the technical capabilities of the iPhone and iPad, the iPad may display the video generated by the

iPhone.

285.     In response to receiving the user input on the at least one UI element, the iPhone's camera may start generating video.

286.     In response to receiving the user input on the at least one UI element, the iPhone's camera may stop generating video.

287.     A first set of video processing tasks on the video generated by the camera of the capture device is performed on the iPhone. By way of non-limiting example, a user can adjust resolution, orientation, frame rate, Apple ProRes, and Color & Dynamic Range. Further, the iPhone-processed video is transferred from the iPhone to the iPad device.  Thus, Final Cut additionally infringes claim 2.

288.     The iPad displays a user interface (UI) having at least one UI element that is configured to receive a user input. In response to receiving input, the settings of the iPhone camera may be changed. Thus, Final Cut additionally infringes claim 4.

289.     The iPhone and iPad are independent, standalone devices, and the iPhone's screen is physically smaller than the display unit of the iPad. Thus, Final Cut additionally infringes claim 5.

290.     The iPhone includes a depth sensor for generating depth information. Thus, on information and belief, Final Cut infringes claim 9 by performing a bokeh effect on the video generated by the iPhone in dependence on said depth information.

291.     Filters, effects, overlays, image overlays, logo overlays, text overlays, and subtitles may be applied to at least a region of the Final Cut video stream. Further, Final Cut may detect user behavior or specific sounds, and in response modify other video processing tasks. Thus, Final Cut additionally infringes claim 12.

292.     The iPad includes a memory and the Final Cut stream may be stored in the memory. Thus, Final Cut additionally infringes claim 17.

293.     As alleged throughout this Complaint, Apple's infringement has been willful, intentional, and deliberate. Apple knows, or should have known, that making, using, offering to sell, and selling, Final Cut would infringe the '323 Patent. Nevertheless, Apple infringed and continues to infringe the '323 Patent.

294.     Apple also knowingly and intentionally induces infringement of claims of the '323 Patent in violation of 35 U.S.C. § 271(b). On information and belief, Apple has had knowledge of the '323 Patent and the infringing nature of Final Cut at least as early as May 23, 2024, when the Patent published. Despite this knowledge of the '323 Patent, Apple continues to actively encourage and instruct its customers and end users to use Final Cut in ways that directly infringe the '323 Patent. Apple also continues to make, use, offer for sale, sell, Final Cut, despite its knowledge of the '323 Patent, thereby specifically intending for and inducing its customers to infringe the '323 Patent through the customers' normal and customary use of Final Cut.

295.     As the direct and proximate result of Apple's conduct, Reincubate has suffered— and will continue to suffer—economic harm, irreparable injury, and damages in an amount to be proven at trial. Reincubate seeks permanent injunctive relief in addition to damages.

296.     Reincubate is also entitled to enhanced damages and reasonable attorneys' fees adequate to compensate it for Apple's willful infringement and other conduct.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Reincubate hereby demands a jury trial on all issues so triable in this action.

## PRAYER FOR RELIEF

WHEREFORE, Reincubate respectfully requests that this Court enter judgment against Apple and grant the following relief:

A.     A judgment in favor of Reincubate that Apple has infringed, either literally or under the doctrine of equivalents, the Patents-in-Suit;

B.     A judgment in favor of Reincubate that Apple has maintained its monopoly in the U.S. mobile OS market through the conduct alleged herein;

C.     A preliminary and permanent injunction prohibiting Apple from further acts of infringement of the Patents-in-Suit and further acts of anticompetitive conduct alleged herein;

D.     A preliminary and permanent injunction prohibiting Apple from exercising or enforcing any provision of the Apple Developer Program License Agreement that authorizes

Apple to terminate, suspend, or otherwise restrict a developer's participation in the program on the basis that the developer has filed, maintained, or participated in a patent-infringement action against Apple;

      E.     Declaratory judgment that Section 11.2(d) of the Apple Developer Program License Agreement is unenforceable and unlawful as applied to Reincubate's claims in this action;

      F.     A judgment and order requiring Apple to pay Reincubate damages, costs, expenses, and pre-judgment and post-judgment interest for Apple's infringement of the Patents-in-Suit, including a judgment and order finding that this is an exceptional case within the meaning of 35 U.S.C. § 285 and awarding to Reincubate its reasonable attorneys' fees against Apple;

      G.     A judgment and order requiring Apple to pay Reincubate damages, costs, expenses, and pre-judgment and post-judgment interest for Apple's anticompetitive conduct as well as treble damages for said conduct pursuant to the Clayton Act § 4; and

      H.     Any and all other relief as the Court may deem appropriate and just under the circumstances.

Dated: January 27, 2026

HECHT PARTNERS LLP

*/s/ David L. Hecht*
David L. Hecht
dhecht@hechtpartners.com
Maxim Price (*pro hac vice* forthcoming)
mprice@hechtpartners.com
Peter Joon Park
ppark@hechtpartners.com
Tanner Murphy (*pro hac vice* forthcoming)
tmurphy@hechtpartners.com

125 Park Avenue, 25th Floor
New York, New York 10017

*Attorneys for Plaintiff*