**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| REINCUBATE, LTD., <br><br>        Plaintiff, <br><br> v. <br><br> APPLE, INC., <br><br>        Defendant. | Civil Action No. 2:26-cv-00828 (CCC-AME) <br><br> **JURY TRIAL DEMANDED** <br><br> ORAL ARGUMENT REQUESTED |

## PLAINTIFF REINCUBATE, LTD.'S OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO TRANSFER VENUE

## TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................1

II. BACKGROUND .................................................................................3

  A. The Parties ...............................................................................3

  B. The DPLA and § 14.10 ...........................................................4

  C. The Camo–Continuity Camera Dispute ..................................6

  D. The D.N.J. Litigation Against Apple ......................................8

III. LEGAL STANDARD ........................................................................9

IV. ARGUMENT......................................................................................11

  A. The DPLA's Forum-Selection Clause Does Not Reach Reincubate's Sherman § 2 or Patent-Infringement Claims.................11

    1. The defined term "Apple Software" is limited to software Apple licenses to the developer "under the Program."..............11

    2. The accused conduct exists independently of the DPLA. ........16

    3. The causes of action do not arise from the DPLA "relationship" between Reincubate and Apple. ........................17

  B. The Public-Interest Factors Defeat Transfer ......................................19

    1. This is an exceptional case.....................................................19

    2. The D.N.J. Antitrust Cases Against Apple Provide a Controlling Efficiency Rationale, and Apple Itself Has Accepted D.N.J. Venue for the Same Conduct. ......................20

    3. D.N.J. Has Substantial Local Interest That Apple's Brief Understates............................................................................22

    4. The Court-Congestion Comparison Apple Invokes Is Distorted...............................................................................23

5.    The *Jumara* Public-Policies-of-the-Fora Factor Does Not Favor Transfer. ...............................................................................24

6.    The State-Law-Familiarity Factor Is Inapplicable. ...................24

C.    The Private-Interest Factors Independently Defeat Transfer. ..............25

1.    Plaintiff's Choice of Forum Is Entitled to Meaningful Deference Because Reincubate's Choice Is Anchored in Specific, Forum-Related Justifications. ....................................25

2.    The "Place Where the Claim Arose" Factor Is Either Neutral or Points Away From N.D. Cal. Under Apple's Own *Ricoh* Test. ........................................................................................26

3.    Apple-Orchestrated Trips Are Not Evidence That Reincubate's Witnesses Find N.D. Cal. Convenient. ...............27

4.    Witness Convenience Weighs Against Transfer ......................27

5.    Compulsory Process: Apple's Own *Quintiles* Rule Points to D.N.J., Not N.D. Cal. ...............................................................32

6.    Apple's Records Are Cloud-Accessible. .................................33

D.    In the Alternative, Only Count II Should Be Severed for Transfer. ....33

V.    CONCLUSION.........................................................................................34

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*APT Sys., Inc. v. Apple Inc.*,
  2022 WL 226812 (E.D. Pa. Jan. 26, 2022) .................................................. 14, 17

*ARP Wave LLC v. Salpeter*,
  364 F. Supp. 3d 990 (D. Minn. 2019) ........................................................... 13, 16

*Atl. Marine Constr. Co. v. U.S. Dist. Court for the W. Dist. of Tex.*,
  571 U.S. 49 (2013) ............................................................................................. 11

*Bremen v. Zapata Off-Shore Co.*,
  407 U.S. 1 (1972) ........................................................................................... 20, 23

*Care One, LLC v. Nat'l Labor Relations Bd.*,
  680 F. Supp. 3d 540 (D.N.J. 2023) ..................................................................... 10

*Cont'l Grain Co. v. Barge FBL-585*,
  364 U.S. 19 (1960) .............................................................................................. 21

*Coronavirus Reporter Corp. v. Apple Inc.*,
  2024 WL 5284023 (D. Wyo. Nov. 21, 2024) ................................................ 14, 17

*Coronavirus Reporter v. Apple Inc.*,
  560 F. Supp. 3d 632 (D.N.H. 2021) .............................................................. 14, 17

*Coronavirus Reporter v. Apple Inc.*,
  No. 21-cv-5567-EMC, 2021 WL 5936910 (N.D. Cal. Nov. 30, 2021) ......... 14, 15

*EpicentRx, Inc. v. Superior Court*,
  18 Cal. 5th 58 (2025) .......................................................................................... 24

*In re Apple Inc.*,
  650 F. App'x 771 (Fed. Cir. 2015) ................................................................... 3, 15

*In re Apple Inc.*,
  No. 2024-111, 2024 WL 1153977 (Fed. Cir. Mar. 18, 2024) ............................. 30

*In re Apple Inc.*,
  No. 2024-129, 2024 WL 3886316 (Fed. Cir. Aug. 21, 2024) ............................ 30

*In re Cray Inc.*,
  871 F.3d 1355 (Fed. Cir. 2017).............................................................................. 26

*In re Genentech, Inc.*,
  566 F.3d 1338 (Fed. Cir. 2009).............................................................................. 23

*In re Howmedica Osteonics Corp.*,
  867 F.3d 390 (3d Cir. 2017)............................................................... 3, 18, 21, 33

*In re Qualcomm Inc.*,
  No. 2025-123, 2025 WL 1743025 (Fed. Cir. June 24, 2025)............................... 30

*In re Remicade (Direct Purchaser) Antitrust Litig.*,
  938 F.3d 515 (3d Cir. 2019)............................................................... 2, 16, 17, 18

*In re Rolls Royce Corp.*,
  775 F.3d 671 (5th Cir. 2014)................................................................................. 33

*IpVenture, Inc. v. Acer, Inc.*,
  879 F. Supp. 2d 426 (D. Del. 2012)...................................................................... 24

*Iragorri v. United Techs. Corp.*,
  274 F.3d 65 (2d Cir. 2001)..................................................................................... 25

*John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*,
  119 F.3d 1070 (3d Cir. 1997)................................................................................ 12

*Jumara v. State Farm Mut. Auto. Ins. Co.*,
  55 F.3d 873 (3d Cir. 1995).................................................................... 10, 21, 23

*Kannuu Pty Ltd. v. Samsung Elecs. Co.*,
  15 F.4th 1101 (Fed. Cir. 2021).............................................................................. 13

*Kisano Trade & Invest Ltd. v. Lemster*,
  737 F.3d 869 (3d Cir. 2013).................................................................................. 10

*Liggett Grp. Inc. v. R.J. Reynolds Tobacco Co.*,
  102 F. Supp. 2d 518 (D.N.J. 2000) ....................................................................... 25

*Lony v. E.I. Du Pont de Nemours & Co.*,
  886 F.2d 628 (3d Cir. 1989)................................................................................... 24

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
  *473 U.S. 614 (1985)* ................................................................................................ 20

*Papa v. IAT Ins. Grp., Inc.*,
  No. 25-04049, 2026 WL 592360 (D.N.J. 2026) ................................................... 27

*Phillips v. Audio Active Ltd.*,
  494 F.3d 378 (2d Cir. 2007) ........................................................... 10, 16, 18

*Piper Aircraft Co. v. Reyno*,
  454 U.S. 235 (1981) .................................................................................... 24

*Quintiles IMS Inc. v. Veeva Sys., Inc.*,
  No. 17-177, 2017 WL 2766166 (D.N.J. June 23, 2017) .................................... 31

*Ricoh Co., Ltd. v. Honeywell, Inc.*,
  817 F. Supp. 473 (D.N.J. 1993) ........................................................... 25

*SLS Int'l, Inc. v. Graber*,
  2007 WL 9718134 (W.D. Mo. Apr. 18, 2007) ............................................... 13, 16

*Stewart Org., Inc. v. Ricoh Corp.*,
  487 U.S. 22 (1988) ...................................................................................... 31

*Sucampo Pharms., Inc. v. Astellas Pharma, Inc.*,
  471 F.3d 544 (4th Cir. 2006) ............................................................. 33

*TC Heartland* LLC v. Kraft Foods Grp. Brands LLC,
  581 U.S. 258 (2017) .................................................................................... 26

*Unbeatablesale.com, Inc. v. Meta Platforms, Inc.*,
  No. 22-6369, 2023 WL 4764813 (D.N.J. July 26, 2023) .................................. 23

*Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*,
  *515 U.S. 528 (1995)* .................................................................................. 20

**Statutes**

15 U.S.C. § 22 ........................................................................................ 25, 33

28 U.S.C. § 1391(b) ................................................................................. 33

28 U.S.C. § 1400(b) ............................................................................. 25, 26, 33

28 U.S.C. § 1404(a) ....................................................................................... 10, 11

**Other Authorities**

N.D. Cal. Civ. L.R. 3-2 ...................................................................................... 28

## I.      INTRODUCTION

This case arises out of Apple's independent decisions to raise the walls around its walled garden to keep Android out; Reincubate was collateral damage and deserves compensation. Those facts do not arise from the developer/platform relationship between Reincubate and Apple but from Apple's independent monopolistic actions. The Developer Program License Agreement ("DPLA") governs the relationship wherein Reincubate gets access to Apple-created software to develop apps like Camo and submits them for approval to Apple. The DPLA does not govern Apple's separate conduct as a horizontal competitor for software more broadly nor its infringement of patents.  Even if the DPLA were the gravamen of this case, these are exceptional circumstances. A forum-selection clause that funnels all antitrust and patent claims against the drafter into the drafter's hometown raises serious public-policy concerns where the clause is itself part of the anticompetitive scheme.

Reincubate, Ltd. sues Apple Inc. for antitrust violations in its monopolization of the U.S. smartphone operating-systems market — the same iOS-platform conduct that the United States Department of Justice, joined by twenty state attorneys general, is litigating against Apple before the Honorable Judge Neals in this very District. *See United States v. Apple Inc.*, No. 2:24-cv-04055 (JXN-LDW) (D.N.J.).

- 1 -

It also sues Apple for infringing two United States patents covering camera-and-video communication technology that Reincubate developed before Apple absorbed it into iOS as the "Continuity Camera" and "Final Cut Camera" features sold on Apple's iOS-running devices. Apple now seeks to send all four counts to the Northern District of California on the strength of a clickwrap forum-selection clause buried in Apple's DPLA, which is tangential to the case. The motion should be denied.

The DPLA's forum-selection clause (§ 14.10) does not reach the Sherman Act § 2 monopolization or patent-infringement counts. Apple's contrary reading rests on a misleadingly abridged quotation of the contract's defined term "Apple Software" and a misapplication of *In re Remicade (Direct Purchaser) Antitrust Litig.*, 938 F.3d 515 (3d Cir. 2019). Instead, § 14.10  of the DPLA captures developer-program disputes that turn on the DPLA itself or on the specific software that Apple provides and licenses to developers to assist with development. It does not capture affirmative infringement claims targeting consumer-distributed iOS and macOS software nor § 2 anticompetitive monopolization of the OS-level market in which Apple directly competes with Android devices and sometimes with app developers. The only federal court decision to consider the DPLA's forum clause in an affirmative-patent-claim case did not accept Apple's transfer theory. *See In re Apple Inc.*, 650 F. App'x 771 (Fed. Cir. 2015) (unpublished, nonprecedential).

Even if the clause reached the antitrust and patent counts, Atlantic Marine's modified analysis of public interest factors would still deny transfer because this case presents exceptional circumstances.

The Court should deny Apple's motion. In the alternative, only the declaratory-judgment count (Count II) should be severed for transfer, with the remaining counts retained in this District. *See In re Howmedica Osteonics Corp.*, 867 F.3d 390, 403-05 (3d Cir. 2017) (explaining the considerations a court undertakes "[i]n exercising its discretion to determine whether it should retain the case in its entirety, transfer the case in its entirety, or sever certain parties or claims in favor of another forum…").

## II.   BACKGROUND

### A.   The Parties

Plaintiff Reincubate, Ltd. ("Reincubate") is a London-based software company organized under the laws of England and Wales. (Complaint, ECF No. 1 ("Compl.") ¶¶ 6, 9.) Reincubate has twice received the King's Award for Enterprise (for outstanding achievement in innovation), the United Kingdom's highest official business honor for trade and innovation. (Compl. ¶ 10.) Reincubate's products include Camo, which transforms a smartphone into a high-quality webcam usable across both Apple and non-Apple devices and software ecosystems. (Compl. ¶¶ 3-4.)

Defendant Apple Inc. ("Apple") is a Cupertino-headquartered global technology company. (Compl. ¶ 11.) Apple maintains a 60–70% share of the U.S. mobile-operating-systems market through its iOS and iPadOS platforms. (Compl. ¶¶ 42-55.) Apple operates nine company-owned retail stores in New Jersey, employs hundreds of personnel in New Jersey across retail and corporate functions, and derives hundreds of millions of dollars in annual revenue from New Jersey consumers and businesses. (Compl. ¶¶ 37-38.) Public LinkedIn profiles further identify dozens of Apple employees resident in New Jersey or working from the New York City Metropolitan Area, some of them in functions material to this dispute, including Apple Services, App Store Review, and wireless and W-LAN 802.11 protocol engineering. (Declaration of David L. Hecht ("Hecht Decl.") ¶¶ 4–7, Ex. B.)

## B.    The DPLA and § 14.10

All developers seeking to use Apple's development toolset and/or distribute iOS applications through the App Store must accept Apple's DPLA and continuously renew that acceptance. The DPLA is a uniform, mass-adhesion agreement presented through a clickwrap interface. (ECF No. 12, Defendant Apple Inc.'s Motion to Transfer Venue ("Mot."), Ex. 3, Declaration of Jeremy Butcher, ("Butcher Decl.") ¶ 6.) The DPLA contains the forum-selection clause Apple invokes:

- 4 -

> Any litigation or other dispute resolution between [the developer] and Apple (other than a challenge to a patent right before a patent office) arising out of or relating to this Agreement, the Apple Software, or [the developer's] relationship with Apple will take place in the Northern District of California, and [the developer] and Apple hereby consent to the personal jurisdiction of and exclusive venue in the state and federal courts within that District with respect [to] any such litigation…

(Butcher Decl. Ex. A § 14.10.) The contract defines "Apple Software" as "Apple SDKs, iOS, watchOS, tvOS, iPadOS, visionOS, and/or macOS, the Provisioning Profiles, FPS SDK, FPS Deployment Package, **and any other software that Apple provides to You under the Program**, including any Updates thereto (if any) that may be provided to You by Apple under the Program." (Butcher Decl. Ex. A § 1.2 (emphasis added).)

The DPLA also contains a termination provision that Reincubate challenges in Count II — § 11.2(d). It authorizes Apple to terminate any developer's access to the program "if You, at any time during the Term, commence an action for patent infringement against Apple." (Compl. ¶ 189 (quoting DPLA § 11.2(d)).) Section 11.2(d) is, by its terms, a contractual restriction on a developer's exercise of federally protected patent-enforcement rights, conditioned on Apple's monopolistic control of the iOS platform. Count II mainly seeks relief in the event Apple invokes § 11.2(d) to retaliate against Reincubate for asserting its patent rights. Apple has not exercised § 11.2(d) to date; Count II is therefore prophylactic in its current posture. The

remedy Count II requests is independent of, and can be severed from, the Sherman § 2 and patent counts that are the bulk of this case.

### C.     The Camo–Continuity Camera Dispute

In 2020, Reincubate launched Camo software which provides a cross-platform interoperability bridge enabling iPhone or Android smartphones to function as high-quality webcams for Mac or Windows computers. (Compl. ¶¶ 4). Beginning in early 2021, Apple-side personnel based principally in Apple's London office managed communication with Reincubate. Declaration of Aidan Fitzpatrick, CEO of Reincubate, submitted herewith as Ex. A to the Hecht Decl. ("Fitzpatrick Decl." ¶¶ 11–14.). Those Apple personnel invited Reincubate's CEO to attend Apple-organized events. (Fitzpatrick Decl. ¶¶ 15–18.)

The day-to-day Apple–Reincubate developer relationship was administered through Apple's London office, not Cupertino. Apple's Senior Partnership Manager for Reincubate, SiQing Lin, works for Apple Europe Ltd in London. (Fitzpatrick Decl. ¶¶ 11–14.) Other Apple Worldwide Developer Relations personnel who interacted occasionally with Reincubate were also London-based, including Apple's Technology Evangelist (Steven Woolcock), an additional Senior Partnership Manager (Alberto Ricci), and a Partnership Manager (Michel Sutter), Apple engineers in the UK like Dean Bilotti as well as members of Apple's Business (retail) team in the UK. (Fitzpatrick Decl. ¶ 13). Cupertino contacts were very rare and

- 6 -

occurred principally at Apple-organized events such as the WWDC keynotes. The everyday relationship was administered out of London. (*Id.* at ¶ 14).

On June 6, 2022, at the WWDC22 keynote, Apple announced "Continuity Camera," a feature integrated into iOS, iPadOS, macOS, and tvOS that allows iPhones to function as webcams for Apple computers. (Compl. ¶¶ 73, 99-105.) The next day, June 7, 2022, Apple invited Reincubate's CEO to its Tantau Avenue offices in Cupertino. (Fitzpatrick Decl. ¶ 16.)

As alleged, on May 4, 2023, SiQing Lin approached Reincubate with an unspecified "opportunity" conditioned on (i) execution of a nondisclosure agreement, and (ii) execution of an intellectual-property license, release, and indemnity covering "Company Content," along with unilateral marketing rights in Apple's favor. (Compl. ¶ 194.) Reincubate accepted the NDA but declined the additional release, indemnity, and unilateral marketing-rights demands as disproportionate to the disclosed offer. The opportunity turned out to be a nomination for an Apple Award (Compl. ¶¶ 3, 194.)  Camo was ultimately named an Apple Design Awards Finalist in the Innovation Category at Apple's 2023 Worldwide Developers Conference. (Compl. ¶¶ 3, 10.)

In June 2023, Reincubate's CEO attended Apple's WWDC23 event at Apple Park and personally informed Apple's Senior Vice President of Software Engineering, Craig Federighi, of the existence of Reincubate's patents. (Compl. ¶¶

172-174.) The complaint reproduces a photograph of Reincubate's CEO with Mr. Federighi taken at that event. (Compl. ¶ 173.)

Apple relies, in part, on Reincubate's post-suit re-acceptances of the DPLA. After this action was filed, Apple presented Reincubate with new DPLA versions for acceptance on February 9, 2026, twice in March of 2026, and again in May of 2026. (Butcher Decl. ¶¶ 8-11, Fitzpatrick Decl. ¶¶ 19–25) Each new version was presented through Apple's standard clickwrap mechanism, just like every pre-suit version. Refusing to accept the new versions would have terminated Reincubate's developer-program access for failure to sign, with the same practical consequence — loss of Reincubate's continued access to the Apple Developer Program and removal of Reincubate's Camo apps from the App Store. (Fitzpatrick Decl. ¶¶ 23–24). In fact, failing to timely sign would prevent **any builds of Reincubate's apps** (e.g. builds that are in testing) from being "notarized" by Apple, which has the effect of preventing nearly all development and testing until the DPLA is signed. *Id*. Reincubate had no meaningful choice but to continue signing the DPLA.

### D.    The D.N.J. Litigation Against Apple

This is not the first antitrust action against Apple in this District grounded in iOS-platform conduct. To the contrary, two parallel proceedings are pending here.

First, in *United States v. Apple Inc.*, No. 2:24-cv-04055 (JXN-LDW) (D.N.J.) (Neals, J.), the United States Department of Justice and twenty state attorneys

general allege that Apple monopolizes the performance smartphone market through iOS-platform exclusionary practices that overlap directly with the conduct at issue here: API withholding, interoperability suppression, anti-cross-platform technical restrictions, and exclusionary conduct against third-party developers. The case has been before the Honorable Judge Neals since reassignment in 2024. (Compl. ¶ 41; *id.* ¶¶ 50 n.13, 55 n.15 (citing *U.S. v. Apple* docket).) **Apple did not move to transfer that action** to the Northern District of California. To the contrary, Apple has acquiesced to litigating these very Apple-iOS-platform issues in this District, where it has been defending the federal and state enforcement action on the merits for about two years.

Second, the Judicial Panel on Multidistrict Litigation has consolidated private antitrust actions against Apple grounded in the same iOS-platform conduct as *In re Apple Inc. Smartphone Antitrust Litigation*, MDL No. 3113. The JPML transferred the consolidated cases to this District in 2024 for coordinated pretrial proceedings before Judge Neals. *See* MDL No. 2:24-md-03113-JXN-LDW (D.N.J.). Apple did not contest the JPML's transfer to this District and has not sought to transfer the MDL out. The same factual nucleus and the same defendant are at issue here.

## III.     LEGAL STANDARD

A motion to transfer venue under 28 U.S.C. § 1404(a) is committed to the district court's discretion. *Kisano Trade & Invest Ltd. v. Lemster*, 737 F.3d 869, 873

- 9 -

(3d Cir. 2013). Absent an enforceable forum-selection clause governing the dispute, the movant bears the burden of demonstrating that transfer is warranted on the public- and private-interest factors articulated in *Jumara v. State Farm Mut. Auto. Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995). *See Care One, LLC v. Nat'l Labor Relations Bd.*, 680 F. Supp. 3d 540, 544-45 (D.N.J. 2023).

Determining whether a clause is enforceable and applicable involves a four-part inquiry: (1) whether the clause was reasonably communicated to the resisting party; (2) whether it is mandatory or permissive; (3) whether the claims at issue "arise out of" the agreement; and, if they do "arise out of" the agreement (4) whether the resisting party has rebutted the presumption of enforceability. *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 383–84 (2d Cir. 2007). Before any burden shifts the threshold step is to determine whether a cause of action "arises out of" the agreement that contains the forum selection clause. *Id. at* 389 (discussing the meaning of "arising out of" in detail). If the answer is that the claim does arise out of the agreement, plaintiff's choice receives no weight, private-interest factors are deemed to favor the contracted forum, and the plaintiff must show that "public-interest factors overwhelmingly disfavor a transfer." *Atl. Marine Constr. Co. v. U.S. Dist. Court for the W. Dist. of Tex., 571 U.S. 49, 62–63, 67 (2013).* But if that threshold finding is not made, the ordinary § 1404(a) framework applies, with the burden remaining on the movant. *Id.*

- 10 -

## IV.      ARGUMENT

### A.      The DPLA's Forum-Selection Clause Does Not Reach Reincubate's Sherman § 2 or Patent-Infringement Claims.

Apple advances two transfer theories: an FSC theory under DPLA § 14.10, and an independent § 1404(a) convenience theory. (Mot. § IV.A, § IV.B.) Apple's FSC theory rests on the proposition that "Reincubate's claims 'aris[e] out of or relat[e] to [the DPLA], the Apple Software, or [Reincubate's] relationship with Apple,'" and therefore must be litigated in N.D. Cal. (Mot. 10.) That reading rests on Apple's partial quotation of § 14.10's defined term, a misapplication of *In re Remicade's* broad-construction gloss, and a refusal to grapple with the only Federal Circuit decision squarely addressing the DPLA's forum clause against affirmative patent-infringement claims.

1.      <u>The defined term "Apple Software" is limited to software Apple licenses to the developer "under the Program."</u>

Apple's principal scope argument reads only the prefix of the contract's defined term "Apple Software." Apple writes that "Reincubate's antitrust and patent claims also arise out of or relate to the Apple Software" because "Apple allegedly maintained an operating-system monopoly … through its control of the iOS software licensed by the DPLA." (Mot. 12.) But the Apple software involved in the case (continuity camera) is not covered by this provision. The DPLA's actual definition of "Apple Software," includes an important limiting qualifier that Apple's brief never quotes. The DPLA defines "Apple Software" as:

- 11 -

> *Apple SDKs, iOS, watchOS, tvOS, iPadOS, visionOS, and/or macOS, the Provisioning Profiles, FPS SDK, FPS Deployment Package, **and any other software that Apple provides to You under the Program**, including any Updates thereto (if any) that may be provided to You by Apple under the Program.*

(Butcher Decl. Ex. A § 1.2 (emphasis added).) The emphasized qualifier limits the defined term to what Apple licenses to the developer for developer use under the Apple Developer Program. *See John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1074-75 (3d Cir. 1997) (in interpreting forum-selection clauses, courts "look to the text of the contract to determine whether it unambiguously states the parties' intentions") (cleaned up).

However, Reincubate's patent-infringement claims do not turn on the developer SDK builds that Apple licenses to Reincubate. They turn on **the software that Apple manufactures and sells to consumers**. (Compl. ¶ 7.) The end users who buy those devices have never signed the DPLA. They are not Apple's developer-program participants. Apple's § 271 infringement liability flows from acts of making, using, offering for sale, and selling those consumer-facing products. Reincubate's claims arise out of Apple's consumer-facing conduct, not Apple's developer-facing licensing of Software Development Kits (SDKs).

Reincubate alleges that Apple monopolized the U.S. mobile-operating-systems market through "systematic use of its control over iOS" (Compl. ¶ 55). The relevant antitrust conduct is Apple's design of iOS and macOS at the OS level. For

- 12 -

instance, the allegations refer to Apple's refusal to extend the same Wi-Fi peer-to-peer access to third-party apps that Apple's own first-party Continuity Camera feature enjoys across iOS and macOS; its appropriation of Camo's cross-device interoperability function as a built-in iOS, iPadOS, and macOS feature; and its broader anticompetitive practices in the smartphone OS market. (Compl. ¶¶ 21, 73, 116-117, 122, 189-192). Reincubate also alleges patent infringement. (Compl. ¶¶ 7, 210, 250). This conduct does not arise out of the DPLA. *See Kannuu Pty Ltd. v. Samsung Elecs. Co.,* 15 F.4th 1101, 1106-11 (Fed. Cir. 2021) (broad "arising out of or relating to" language did not extend a confidentiality agreement); *ARP Wave LLC v. Salpeter*, 364 F. Supp. 3d 990, 1000-02 (D. Minn. 2019) (patent-infringement claims fell outside license-agreement forum-selection clauses where the patents existed independently of the agreements and the court did not need to interpret the agreements to resolve the claims); *SLS Int'l, Inc. v. Graber*, 2007 WL 9718134, at *2-3 (W.D. Mo. Apr. 18, 2007) (declaratory judgment of patent noninfringement and invalidity fell outside an NDA forum-selection clause where the patent dispute existed apart from the agreement).

Apple opens with the assertion that "[e]very court that has been asked to transfer a developer's antitrust case to the Northern District of California — including where the developer also brings patent claims — has done so." (Mot. 1.) The cited record does not bear that weight. The DPLA-enforcement half of Apple's

- 13 -

string-cite reduces to **two** transfer grants: *Coronavirus Reporter v. Apple Inc.*, 560 F. Supp. 3d 632 (D.N.H. 2021), and *Coronavirus Reporter Corp. v. Apple Inc.*, 2024 WL 5284023, at *3,5 (D. Wyo. Nov. 21, 2024). Both were brought by the same plaintiff principal, whose three earlier near-carbon-copy actions were consolidated and summarily dismissed with prejudice. *See Coronavirus Reporter v. Apple Inc.*, No. 21-cv-5567-EMC, 2021 WL 5936910 (N.D. Cal. Nov. 30, 2021); *see also Coring Co. v. Apple Inc.*, No. 21-82235, Order Granting Transfer at 4 (S.D. Fla. Feb. 18, 2022) (ECF No. 36) (granting transfer in part because the prior dismissed N.D. Cal. action gave that district "substantial familiarity" with the plaintiff's claims). The third case in Apple's string-cite is *APT Sys., Inc. v. Apple Inc.*, 2022 WL 226812 (E.D. Pa. Jan. 26, 2022). That is not an antitrust case at all; the plaintiff pleaded only bailment, conversion, tortious interference, and unjust enrichment. *Id.* at 2.

The patent-claims part of Apple's "every court…has transferred" gloss fares no better. The only case combining developer status, antitrust, and patent claims is *Coring Co. v. Apple Inc.*, No. 21-82235 (S.D. Fla. 2022). There were some very specific facts in the *Coring*: (1) there were already cases in California involving the Plaintiff's principal, **the same principal from the two *Coronavirus Reporter* cases** cited by Apple; (2) those cases were already consolidated and summarily dismissed on the complaints alone; (3) Apple introduced evidence the plaintiff was likely not a legitimate Florida corporation; and (4) the plaintiff "elect[ed] not to respond

- 14 -

meaningfully to Defendant's legal arguments." *Coring Co. v. Apple Inc.*, No. 21-82235, Order Granting Transfer at 2, 4–5 (S.D. Fla. Feb. 18, 2022) (ECF No. 36). None of those features applies to Reincubate.

Meanwhile, the only Federal Circuit decision considering the DPLA forum clause against affirmative patent claims squarely did not accept Apple's transfer theory. *In re Apple*, 650 F. App'x at 773-74 (not selected for publication). There, Apple invoked a materially similar developer-agreement forum-selection clause against affirmative patent-infringement claims. The district court took issue with Apple's reading, accepting that the developer-relationship language covered the app-marketing and delivery relationship, not every dispute about Apple's independent activities. The court refused to stretch "Apple Software" to every use of iOS outside development and testing. *Id.* at 773-74. The Federal Circuit denied mandamus. *Id.* at 774.

Other district-court authorities reinforce that reasoning. *ARP Wave,* 364 F. Supp. 3d at 1000-02 (patent-infringement claims outside license-agreement forum clauses where the patents existed independently of the agreements); *SLS Int'l,* 2007 WL 9718134, at *2-3 (DJ noninfringement and invalidity claims outside NDA forum selection clause*); Phillips*, 494 F.3d at 389-91 (copyright claims fell outside forum-selection clause).

2.      The accused conduct exists independently of the DPLA.

Apple's "but for" framing is that "the conduct underlying [Reincubate's] claims would not have occurred but for the License Agreement and the relationship it created" (Mot. 12 (quoting *Coronavirus Reporter*)). It is factually wrong. The conduct underlying Reincubate's claims would have occurred whether or not Reincubate ever clicked through the DPLA. But it is also **not** the standard. The clause-scope question is whether the claims "arise out of or relate to" the contract. *In re Remicade*, 938 F.3d at 522-24 (expressly rejecting the practice of conflating arising out of analysis with but-for causation analysis.).

As discussed above, the accused acts occur as to every infringing Apple device sold to consumers. (Compl. ¶ 7.) Reincubate's antitrust claim arises from that consumer-market and platform-level conduct.

The *Coronavirus Reporter and APT Sys.* decisions that Apple invokes are distinguishable on facts. Each involved a developer challenging Apple's exercise of App Store powers to adversely act on the developer's own application — app review, account ownership, in-app revenue, or distribution. *Coronavirus Reporter*, 560 F. Supp. 3d at 640–41; *Coronavirus Reporter Corp.*, 2024 WL 5284023, at *3; APT Sys., 2022 WL 226812, at *11–12. The DPLA and Plaintiff's rights under that agreement were the linchpin of the dispute in each case. Here, the DPLA is not the linchpin of the antitrust or patent claims; it is incidental to them. *See In re Remicade*,

- 16 -

938 F.3d at 522-24 (forum-selection clauses extending to claims "connected in any way" with the contract still require some connection between the contract and the dispute).

### 3. The causes of action do not arise from the DPLA "relationship" between Reincubate and Apple.

The "relationship with Apple" prong of DPLA § 14.10 must be read in context. The relationship contemplated is the developer-program relationship, not every transaction or interaction Reincubate ever had with Apple. The complaint's allegations about Apple's induced disclosure (Compl. ¶ 126) describe certain features of Apple's relationship with Reincubate during the developer-program engagement. But the operative § 271 conduct (Apple's nationwide sale of infringing iOS, iPadOS, macOS, and tvOS devices, and Final Cut Camera software) and the operative § 2 conduct (Apple's exclusionary practices in the OS market) are independent of "relationship" Reincubate had with Apple as a developer. Apple's anti-competitive conduct is not developer-specific and would have occurred even if Reincubate had never developed Camo or signed the DPLA. *See e.g. Phillips,* 494 F.3d at 389 (statutory IP claims subject to FSC only where the rights "originated" within the contract).

Apple cites *In re Remicade* for the proposition that "extremely broad" construction makes claims "connected in any way" to a contract "arise out" of it. (Mot. 11.) First, Remicade is an FAA arbitration-scope case. Apple lifts its rhetoric

("extremely broad," "connected in any way") and drops the FAA-specific framework that animates it, the factual hook (contract-as-source-of-the-very-price) that limits its reach, and the binding forum-selection test. *In re Remicade*, 938 F.3d at 519.

Second, Remicade's actual holding cuts the other way. The Remicade plaintiff's antitrust claim was arbitrable to the operative agreement only because the agreement itself "set[] the drug prices and govern[ed] the commercial relationship between the parties," making the inflated price impossible to prove "without reference to, and reliance upon," the contract. *Id*. at 524–25. Reincubate's damages do not turn on any DPLA term: the § 271 counts rest on Apple's sale of consumer iOS, iPadOS, macOS, and tvOS devices to end users who never signed the DPLA, and the § 2 monopolization claim concerns Apple's nationwide OS-platform conduct, not any developer-program price, license, or contractual obligation a court would need to interpret. Remicade itself recognized this distinction, citing with approval cases holding that antitrust claims a court can "resolve … without reference to the agreement containing the arbitration clause" fall outside such provisions. *Id*. at 524 n.7. *In re Remicade* also rejected Apple's but-for analysis. *Id*. at 524.

Apple overplays the holding in *Howmedica*, 867 F.3d 390. Count II seeks a declaratory judgment that DPLA § 11.2(d) is unenforceable as an unreasonable restraint of trade under § 1 of the Sherman Act not as a matter of contract

- 18 -

interpretation. Compl. ¶¶ 203–09. Moreover, the Third Circuit did not announce in *Howmedica* a default rule that the whole case must be transferred if one claim falls with an FSC. *Id.* at 403–05. Severance is available and expressly contemplated by the *Howmedica* factors. *Id.* Reincubate consents to severance of Count II in the alternative if the Court concludes that § 14.10 reaches no other count. *See infra* § IV.D.

### B.    The Public-Interest Factors Defeat Transfer

Whether the Court resolves the threshold DPLA scope question favorably to Reincubate or whether it concludes that *Atl. Marine* applies, the public-interest analysis points to D.N.J.

#### 1.    This is an exceptional case.

Even if the Court concludes that the DPLA forum-selection clause reaches this action, the extraordinary posture of this case satisfies *Atl. Marine's* exceptional case standard. The DPLA contains, in the same instrument, both (i) the forum-selection clause Apple invokes (§ 14.10) and (ii) the contractual provision Reincubate alleges in Count II is itself an anticompetitive instrument — § 11.2(d), which permits Apple to terminate any developer's program access "if You … commence an action for patent infringement against Apple." (Compl. ¶ 189.)

That contractual structure makes this case "exceptional." Section 11.2(d) is, on Reincubate's pleading, a contractual restriction on the federally protected right to

- 19 -

enforce patents, imposed without negotiation, by a monopolist, on developers whose access to the U.S. mobile-OS market depends on the Apple Developer Program. (Compl. ¶¶ 189-209.) This creates, for Apple, a vice designed to prevent developers from enforcing antitrust and infringement laws. This pressure would compound if all federal rights that developers have against Apple are folded into the contractual term "Your relationship with Apple" of § 14.10.  In other words, enforcing § 14.10 to funnel all developer antitrust challenges into Apple's home forum would further the very scheme challenged here. The "prospective waiver" doctrine preserved in *Mitsubishi* exists to prevent that outcome. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 637 n.19 (1985); The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972); *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer, 515 U.S. 528, 540 (1995)* (forum-selection clauses must yield where enforcement would prevent vindication of statutory rights).

2.    The D.N.J. Antitrust Cases Against Apple Provide a Controlling Efficiency Rationale, and Apple Itself Has Accepted D.N.J. Venue for the Same Conduct.

The United States and twenty state attorneys general chose D.N.J. as the forum to bring federal antitrust enforcement against Apple grounded in iOS-platform conduct. *U.S. v. Apple*, No. 2:24-cv-04055. The JPML chose D.N.J. as the forum to coordinate consolidated private antitrust actions against Apple on overlapping iOS

conduct. *In re Apple Inc. Smartphone Antitrust Litig.*, MDL No. 3113 (D.N.J., Neals, J.). Both proceedings remain pending in this District before Judge Neals.

Apple's Motion frames *U.S. v. Apple* and the Smartphone MDL as "factually and legally distinct" because "none allege monopolization of a 'mobile operating system market' as this case asserts." (Mot. 23.) That puts semantics over substance. Both cases involve the same iOS platform; the smartphone market; the same conduct; the same defendant. *See U.S. v. Apple*, ECF No. 283 at 18 (June 30, 2025). That legal and factual record is material to Reincubate's § 2 claim.

The judicial-economy rationale for keeping the case in D.N.J. is therefore compelling. *See Cont'l Grain Co. v. Barge FBL-585*, 364 U.S. 19, 26 (1960) (efficiency rationale for consolidating overlapping litigation favors retention); *Howmedica*, 867 F.3d at 405 (judicial economy is a weighty public-interest factor). Discovery on Apple's iOS-platform conduct in this case will overlap substantially with discovery in *U.S. v. Apple* and the Smartphone MDL. The economist experts likely to testify in this case will testify to the same iOS market structure addressed in *U.S. v. Apple*. At the very least, cross-sharing of document discovery and sealed filings would be far simpler in the same district.

Apple's posture in *U.S. v. Apple* and the Smartphone MDL is evidence that D.N.J. is a workable forum for adjudicating the iOS-platform conduct at the core of this case. Apple did not move to transfer to N.D. Cal. Apple has been litigating on

the merits in this District for two years. In the Smartphone MDL, Apple accepted the JPML's 2024 transfer to this District; Apple has not moved to transfer the MDL out. Apple cannot credibly claim that the same forum is so inconvenient that the demanding § 1404(a) burden is met. Apple's litigation conduct in this District speaks directly to the *Jumara* practical considerations factor and to the *Continental Grain* judicial-economy interest. *Jumara*, 55 F.3d at 879; Cont'l Grain, 364 U.S. at 26.

> 3.   D.N.J. Has Substantial Local Interest That Apple's Brief Understates.

Apple frames the local-interest factor as turning on where its accused products were "designed, developed, and tested." (Mot. 19-20.) But Apple concedes that "Final Cut Camera and the Live Multicam functionality were researched, designed, developed, and tested primarily in the **Central District of California**." (Mot. 25 (emphasis added).) Under Apple's framing, C.D. Cal., rather than N.D. Cal., has the substantial local interest in adjudicating Count IV. The factor does not unify around N.D. Cal.; it splits across districts.

D.N.J. has at least equally substantial local interest in adjudicating Apple's iOS-platform anticompetitive conduct. In addition to the multiple similar actions already in this district discussed in detail above, Apple's New Jersey presence is broader than Apple's declarations admit. Public LinkedIn profiles identify more than fifty Apple employees with New Jersey residence or NYC-Metro work base, spanning Apple Services, Apple Music, Apple Pay, App Store Review, wireless

- 22 -

engineering, iTunes Forecasting, information security, and a wide range of additional functions. (Hecht Decl. ¶¶ 4-7 & Ex. B.) Apple's brief frames its New Jersey footprint as merely retail, but the full public record places senior Apple personnel in functions directly relevant to the iOS platform and the App Store in this State.

4.    The Court-Congestion Comparison Apple Invokes Is Distorted.

Apple cites a comparison between D.N.J.'s 92,769 pending civil cases and N.D. Cal.'s 15,305, and between D.N.J.'s 46.8-month median filing-to-trial pace and N.D. Cal.'s 35.4 months. (Mot. 20-21.) Apple's own cited authority recognizes that aggregate statistics "do not control" the analysis. *Unbeatablesale.com, Inc. v. Meta Platforms, Inc.*, No. 22-6369, 2023 WL 4764813, at *3 n.2 (D.N.J. July 26, 2023).

The aggregate statistics about D.N.J. civil docket are distorted by mass-tort multidistrict cases like pelvic-mesh, asbestos, and pharmaceutical MDLs. These cases skew the trial-pace time of the District's individual case dockets. Apple cites no N.D. Cal.-specific time-to-trial statistic for patent or antitrust cases. The comparison Apple offers is between the entirety of D.N.J.'s civil docket and the entirety of N.D. Cal.'s. But Apple places too much weight on that. Crude aggregate statistics about congestion "appears to be the most speculative" factor and cannot accurately show that the transferee district is measurably faster for the relevant case

- 23 -

type. *See In re Genentech, Inc.*, 566 F.3d 1338, 1347 (Fed. Cir. 2009). This factor should not move the analysis one way or the other.

### 5. The *Jumara* Public-Policies-of-the-Fora Factor Does Not Favor Transfer.

The public-policy factor under Jumara is a separate inquiry from the *Bremen/Mitsubishi* enforceability analysis addressed in § IV.B.1. *See The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972); *Jumara*, 55 F.3d at 879–80. Apple invokes this factor only by saying that New Jersey and California both favor enforcement of valid forum-selection clauses. (Mot. 21.) But that point does not support transfer where the dispute is whether the clause is valid as applied to these claims in the first place. *See EpicentRx, Inc. v. Superior Court*, 18 Cal. 5th 58, 76 (2025). At most, this factor is neutral.

### 6. The State-Law-Familiarity Factor Is Inapplicable.

Apple's argument that D.N.J. would be unfamiliar with California state law (Mot. 21-22) is misplaced. This is a federal-question case under the Sherman Act, the Patent Act, and the Declaratory Judgment Act. The state-law-familiarity factor has no work to do. *See IpVenture, Inc. v. Acer, Inc.*, 879 F. Supp. 2d 426, 433 (D. Del. 2012) ("This is not a diversity case, and thus knowledge of state law is irrelevant here.").

### C.     The Private-Interest Factors Independently Defeat Transfer.

If the Court reaches the private-interest factors, Apple's case for transfer collapses against Apple's own concessions.

> 1.     <u>Plaintiff's Choice of Forum Is Entitled to Meaningful Deference Because Reincubate's Choice Is Anchored in Specific, Forum-Related Justifications.</u>

Apple invokes the reduction of deference afforded to a foreign plaintiff recognized in *Lony v. E.I. Du Pont de Nemours & Co.*, 886 F.2d 628, 633-34 (3d Cir. 1989), and *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255-56 (1981). (Mot. 23.) But *Lony*'s reduction applies where the foreign plaintiff's chosen forum is gratuitous. Reincubate's choice is not gratuitous. Reincubate filed in the District where (i) the United States is litigating the same iOS-platform conduct against the same defendant before Judge Neals; (ii) the JPML has consolidated private antitrust actions against Apple on the same conduct; (iii) Apple has not challenged forum in those cases; (iv) Apple maintains nine retail stores selling the infringing iOS devices (Compl. ¶¶ 37, 40); (v) 28 U.S.C. § 1400(b) is independently satisfied for patent venue by acts of infringement in those stores; and (vi) 15 U.S.C. § 22 is independently satisfied for antitrust venue because Apple transacts business and is found here (Compl. ¶ 36). *See Medien Patent Verwaltung AG v. Warner Bros. Entertainment Inc., 749 F. Supp. 2d 188 (S.D.N.Y. 2010); Iragorri v. United Techs.*

- 25 -

*Corp.*, 274 F.3d 65, 71-74 (2d Cir. 2001) (en banc). Reincubate's choice has multiple bona fide forum-related justifications.

      2.     <u>The "Place Where the Claim Arose" Factor Is Either Neutral or Points Away From N.D. Cal. Under Apple's Own *Ricoh* Test.</u>

Apple invokes the "center of gravity" approach articulated in *Ricoh Co., Ltd. v. Honeywell, Inc.*, 817 F. Supp. 473, 481 (D.N.J. 1993), and *Liggett Grp. Inc. v. R.J. Reynolds Tobacco Co.*, 102 F. Supp. 2d 518, 530, 536-37 (D.N.J. 2000). Apple's own application of that test undercuts its position.

As to Count IV (infringement of the '258 and '323 Patents through Final Cut Camera and Live Multicam): Apple expressly concedes that "Final Cut Camera and the Live Multicam functionality were researched, designed, developed, and tested primarily in the **Central District of California**." (Mot. 25 (emphasis added).) Under *Ricoh*, the center of gravity for Count IV is C.D. Cal., not N.D. Cal. Apple's "much closer to the Northern District of California than to New Jersey" framing (Mot. 25) is geographic handwaving, not the center-of-gravity analysis Apple's own test calls for.

As to Count I (Sherman § 2 monopolization): the gravamen is Apple's nationwide consumer harm via iOS-deployment lock-in, with operative effects occurring in every U.S. district, including New Jersey. The center-of-gravity framework was not designed for, and does not naturally apply to, nationwide consumer-harm antitrust claims.

As to Counts III–IV (patent): 28 U.S.C. § 1400(b) patent venue is satisfied by acts of infringement in this District, namely Apple's sale of infringing iOS devices through its nine New Jersey retail stores (Compl. ¶ 40). The center-of-gravity test for *transfer* cannot displace the textual statutory basis for *venue*. See *TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, 581 U.S. 258 (2017); In re Cray Inc., 871 F.3d 1355, 1360-65 (Fed. Cir. 2017).

### 3. Apple-Orchestrated Trips Are Not Evidence That Reincubate's Witnesses Find N.D. Cal. Convenient.

Apple cites Reincubate's complaint allegations that Reincubate personnel attended events in Cupertino as evidence that "Reincubate's employees have traveled to Cupertino for ordinary business in the past." (Mot. 27 (citing Compl. ¶¶ 156, 172-74; *Papa v. IAT Ins. Grp., Inc.*, No. 25-04049, 2026 WL 592360, at *4 (D.N.J. 2026)).) But the only trips there were the ones orchestrated and coordinated by Apple. (Fitzpatrick Decl. ¶¶15–18.) Apple cannot bootstrap its own invitations into a finding that N.D. Cal. is convenient for Reincubate as a litigation party.

### 4. Witness Convenience Weighs Against Transfer

Apple's brief supplies a quantification of the difference in travel time. Apple writes: "While there are also a few employees located in Cambridge, United Kingdom—for whom travel to New Jersey (8 hours) instead of California (11 hours) is slightly shorter—these few employees do not outweigh the great majority concentrated in or near the Northern District of California." (Mot. 27.) That same

- 27 -

arithmetic applies to Reincubate's principal London-based witnesses. Travel from London to Newark is materially shorter than travel from London to San Francisco. Reincubate has no legal establishment in the United States and engages two US-based contractors: a Windows engineer in New Hampshire and a community manager in Flushing, New York. (Fitzpatrick Decl. ¶ 5.) Both are materially closer to Newark than to San Francisco. The factor that Apple frames as a "slight" advantage for D.N.J. as to Apple's UK employees becomes a meaningful advantage for D.N.J. when applied to Reincubate's witnesses, whose attendance at trial is a real prospect.

Moreover, Apple's entire brief is laser focused on San Francisco as the locus of the case, if transferred. But Apple's motion is, in operative terms, likely a motion to transfer this case to the **San Jose Division** of the Northern District of California, not San Francisco. Apple is headquartered in Cupertino, and Apple's transfer brief frames the operative iOS-platform conduct as Cupertino-centered. (Mot. 19-20, 25.) Cupertino lies in Santa Clara County, and under the Northern District's local assignment rule, "all civil actions that arise in the counties of Santa Clara, Santa Cruz, San Benito or Monterey shall be assigned to the San Jose Division." N.D. Cal. Civ. L.R. 3-2(e). The San Francisco airport that Apple's brief relies on is thus just one leg of the journey to Apple's hometown court. Travel from the UK to the San Jose courthouse is longer than travel from the UK to San Francisco because direct

flights are not offered. (Fitzpatrick Decl. ¶¶ 8–9.) Apple's eleven-to-twelve-hour London-SF figure (Mot. 27) thus understates the actual travel burden of the forum Apple is requesting.

The Apple-Reincubate developer relationship was administered out of Apple's London office, not Cupertino. (Fitzpatrick Decl. ¶¶ 11–14). Apple's Senior Partnership Manager for Reincubate, who is a central witness on the issues underlying Reincubate's claims is London-based. Other Apple Worldwide Developer Relations personnel relevant to the dispute are also based in London. (*Id.*) Apple has Camera & Photos engineering managers and engineers in Cambridge, United Kingdom. Apple's own declaration acknowledges that "5 engineers in Cambridge (UK) … work on features that are incorporated into Continuity Camera." (Ford ¶ 11.)

Apple's remaining non-N.D. Cal. witness pool, per Apple's own declarations, includes Culver City, San Diego, Boulder, Pittsburgh, Washington D.C., Singapore, Shanghai, Austin, and Arizona; plus at least one Apple Video Applications group member in New Jersey itself (Infusino ¶ 8). N.D. Cal. is not materially more convenient than D.N.J. for any of these witnesses except those actually resident in or near Cupertino. The "great majority concentrated in or near the Northern District of California" framing (Mot. 27) does not survive contact with Apple's own declaration record.

Public LinkedIn profiles also identify substantial Apple personnel in New Jersey and the NYC-Metro area whose existence Apple's declarations do not acknowledge. (Hecht Decl. ¶¶ 4-7 & Ex. B.) Most notably for wireless-engineering portions of the dispute, at least one Apple Senior System Design Engineer specializing in W-LAN 802.11 b/g/n/ac protocol resides in Jersey City, New Jersey. (*Id.*) That is the very technical domain that Apple's Developer Technical Support team identified as the source of Camo's peer-to-peer Wi-Fi performance issue. (Compl. ¶ 116).

Apple's evidentiary proffer is threadbare. Apple's declarants describe team-size head counts, generic "concentration in or near" framings, people who plan to move in the future (Matthews ¶ 1: "plan[s] to move … in June 2026"), and unnamed former employees (Ford ¶ 14). Apple identifies broad groups like 'App Store review personnel' and 'Developer Relations leadership' (Mot. 19; Butcher ¶¶ 12–15), and generic 'marketing,' 'patent licensing,' and 'finance' personnel (Mot. 7; Huff ¶ 5; Anderson ¶¶ 3–6; Matthews ¶¶ 5–6). But Apple offers no context for why any of these collectives, as opposed to identified individuals tied to identified issues, would have evidence material to this case. Apple does not identify which specific Apple witnesses are uniquely material to which specific issues in this case, why those witnesses cannot travel to D.N.J. on the same terms Apple's witnesses routinely travel for litigation worldwide, or which documents are unavailable outside N.D.

- 30 -

Cal. Apple relies on generic framing, unnamed employees and general hand-waving. And it is unclear why App store review was included at all.

The Federal Circuit has recently declined, in three nonprecedential mandamus orders involving Apple as petitioner or co-petitioner, to disturb district-court findings that Apple's witness-locus declarations lacked the specificity needed to support transfer to the Northern District of California. *See In re Apple Inc., No.* 2024-111, 2024 WL 1153977, at *2 (Fed. Cir. Mar. 18, 2024) (Apple "failed to identify any specific third-party individuals in Northern California who were unwilling to testify"); *In re Apple Inc.*, No. 2024-129, 2024 WL 3886316, at *2 (Fed. Cir. Aug. 21, 2024) (district court "plausibly found deficiencies in Apple's declarations and presentations of the evidence concerning unidentified individuals as witnesses and failure to provide information about the location of witnesses and sources of proof"); *In re Qualcomm Inc.,* No. 2025-123, 2025 WL 1743025, at *1 (Fed. Cir. June 24, 2025) (endorsing the district court's "case-specific assessment" and requirement of "individualized, case-by-case consideration of convenience and fairness" (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988))). Although those orders applied Fifth Circuit law, the particularity principle they reflect is consistent with the Third Circuit's *Jumara* framework and the pattern they reflect is consistent with Apple's evidence here.

5.    Compulsory Process: Apple's Own *Quintiles* Rule Points to D.N.J., Not N.D. Cal.

Apple writes that "[c]ompulsory process over non-party witnesses has been referred to as the single most important factor in a Section 1404 analysis." (Mot. 28 (citing *Quintiles IMS Inc. v. Veeva Sys., Inc.*, No. 17-177, 2017 WL 2766166, at *5 (D.N.J. June 23, 2017)).) Apple identifies two non-party witness candidates with N.D. Cal. connections: CORSAIR Gaming, Inc. (a third party owning the EpocCam prior-art technology allegedly relevant to Apple's invalidity defense), and "a former software engineer who worked extensively on Continuity Camera" who resides in N.D. Cal. (Mot. 28 (citing Ford ¶ 14).) But The CORSAIR/EpocCam witness's relevance is purely speculative, no prior art technology or disclosure has been identified, Apple just baldly argues that they had a similar product to Camo at some point. And CORSAIR's subsidiary Elgato is the company that owns EpocCam, not Corsair. (Hecht Decl. ¶8, Ex. C). Elgato is headquarterd in Munich, Germany, not California. (*Id.* at ¶9, Ex. D)

Moreover, Apple's brief omits the second non-party witness that Ford's declaration identifies. Ford's declaration says that, in addition to the former engineer Apple identifies, "[t]here is a second software engineer that worked on peripheral and various side features of Continuity Camera and is also no longer at Apple as he is now attending graduate school at Columbia University." (Ford ¶ 14.) Columbia University is in New York City and is therefore within this Court's Rule 45(c)(1)

- 32 -

subpoena reach for trial and well beyond N.D. Cal.'s. If, as Apple writes, compulsory process is the single most important factor (Mot. 28), then the existence of a non-party Continuity Camera engineer within D.N.J.'s reach but beyond N.D. Cal.'s favors retention here, not transfer.

### 6. Apple's Records Are Cloud-Accessible.

Apple's own declarations describe its records as electronically maintained and remotely accessible. Apple's IP Transactions witness explains that "the electronic records for Apple's confidential third-party patent transaction and patent licensing matters … can only be accessed by people with proper credentials or access rights" and that "many of them … are stored in shared locations." (Anderson ¶ 6.) Apple's Continuity Camera source code access is restricted on a need-to-know basis via Apple's internal source code repositories. (Ford ¶ 16; *see also* Infusino ¶¶ 11-12 (same for Final Cut Camera source code).) But Apple still has not identified any concrete geographical restrictions, only technical ones.

### D. In the Alternative, Only Count II Should Be Severed for Transfer.

If the Court were to conclude that § 14.10 reaches Count II (the declaratory-judgment challenge to DPLA § 11.2(d)) but does not reach Counts I, III, and IV, the appropriate remedy is severance of Count II for transfer, with the remaining counts retained in this District.

*Howmedica*, 867 F.3d at 403-05, recognizes severance as the proper remedy where contracting parties' "settled expectations" can be honored without requiring the wholesale transfer of claims unrelated to the contract. Severance is appropriate where the countervailing interests in retaining the non-FSC claims in the chosen forum substantially outweigh the FSC parties' settled expectations as to the FSC-covered claims. See also *In re Rolls Royce Corp.*, 775 F.3d 671, 681 (5th Cir. 2014) (severance for fairness); *Sucampo Pharms., Inc. v. Astellas Pharma, Inc.*, 471 F.3d 544, 549-50 (4th Cir. 2006) (multi-claim severance framework).

The countervailing interests here are substantial. The Sherman § 2 and patent-infringement counts have independent statutory venue bases. 15 U.S.C. § 22; 28 U.S.C. § 1391(b); and 28 U.S.C. § 1400(b). The DPLA's choice-of-forum provision should not be permitted to override these textual statutory bases. Severance preserves Apple's bargained-for forum if the Court finds that Count II arises from the DPLA itself, while honoring Reincubate's right to litigate its independent federal-statutory claims in a forum independently authorized by Congress and where the United States and the JPML have themselves chosen to litigate the same Apple iOS-platform conduct.

## V. CONCLUSION

For the foregoing reasons, Reincubate respectfully requests that the Court:

1. **Deny** Apple's Motion to Transfer Venue as to all four counts; or

- 34 -

2. **In the alternative**, sever Count II (declaratory judgment) for transfer to the Northern District of California and retain Counts I, III, and IV in this District.

Dated: May 22, 2026
Newark, New Jersey

Respectfully submitted,

**HECHT PARTNERS LLP**

By: */s/ David L. Hecht*
David L. Hecht
Maxim Price (pro hac vice forthcoming)
Peter Joon Park
Tanner Murphy (pro hac vice forthcoming)
125 Park Avenue, 25th Floor
New York, New York 10017
Telephone: (212) 851-6821
dhecht@hechtpartners.com
mprice@hechtpartners.com
ppark@hechtpartners.com
tmurphy@hechtpartners.com

*Attorneys for Plaintiff Reincubate, Ltd.*

- 35 -

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on May 22, 2026, I caused the foregoing document

and all ancillary documents attached thereto to be served on all counsel through the

Court's ECF system.

*/s/ David L. Hecht*
David L. Hecht
